HORNSBY, Chief Justice.
The plaintiff, James A. Sharit, appeals from a summary judgment for the defendant, Jack Harkins, a co-employee of Shar-it. Sharit had brought suit pursuant to Code 1975, § 25-5-ll(e), alleging that Har-kins had willfully and intentionally allowed employees to circumvent a safety device that was part of the gas torch that Sharit used on the job.

Facts

This controversy arose out of an accident suffered by Sharit while employed by USX Corporation at its United States Steel plant in Fairfield, Alabama. Sharit had been employed as a “scarier” for approximately six months prior to his accident. The scarfing process required that Sharit use an oxygen-natural gas torch to remove defects from large steel slabs produced at the plant. The torch has separate controls for the flows of oxygen and natural gas to the nozzle. There is another control, a lever, that releases oxygen under 150 pounds of pressure to the nozzle. It is this high-pressure oxygen which does the actual cutting of metal.
On the day of the accident, Sharit was engaged in scarfing steel slabs. It appears to be uncontroverted that Sharit had completed scarfing one side of a slab and was moving to another side when his foot slipped into a space between two slabs and he was caused both to lose his balance and to drop the torch. Prior to beginning the scarfing job, Sharit had “pinned” the oxygen control lever in the “open” position; this caused a constant flow of oxygen under 150 pounds of pressure to the torch nozzle. Once Sharit dropped the torch, the high pressure oxygen caused the torch to “snake around” much like an unattended water hose under high pressure.
Eventually the torch wrapped around Sharit’s leg with the nozzle pointed toward his groin. Sharit was burned by the torch. However, Sharit himself was able to grab the torch, remove the pin from the oxygen control lever, and then extinguish the flame. The “pin” was simply a piece of scrap steel rod that Sharit had forced into the lever to keep it open. This pin was not part, of the torch’s operating equipment. In deposition testimony, Sharit admitted that he had actually pinned the lever open. He also admitted that no one had ever instructed him to pin the lever open and that Harkins had not trained him to use a pin in operating the torch.
Harkins admitted in deposition testimony that he was aware that some of the scar-fers were pinning the lever down. Harkins also stated that some of the scarfers may have been trained to use the pin to keep the oxygen flow lever in the open position. However, Harkins denied that he was aware before Sharit’s accident that pinning the oxygen control lever down created a safety hazard to the employees. Moreover, he stated that in his five years as a supervisor he had never seen a torch behave in the same manner as the torch that injured Sharit. Harkins denies that any parts were removed from the torches before they were put into use.
Sharit stated in his deposition that he had been taught by another scarier to pin the oxygen control lever in the open position. At one point, he said that he knew of *878 no way to operate the torch other than to pin the lever in the open position.

Issue

Sharit sued Harkins pursuant to Code 1975, § 25-5-ll(c), alleging the willful and intentional removal or disabling of a safety device or guard. Sharit’s theory is that the oxygen control lever constituted a safety device and that Harkins had willfuly and intentionally allowed that device to be disengaged or made inoperable by Sharit. Thus, Sharit contends that Harkins’s conduct violated Code 1975, § 25-5-ll(c)(4).

Disposition

In his brief to this Court, Sharit contends that the oxygen control lever was a safety device. He asserts that the lever had the function of a “dead man switch” because, should the operator somehow lose his grip on the torch and drop it or should it be knocked from his grip, the lever would automatically revert to the “closed” position and cut off the flow of high-pressure oxygen. In this manner the size of the flame emitted by the torch would be instantly reduced, and the danger of the torch “snaking around” as it did in Sharit’s case would be averted.
Sharit relies solely on the case of Bailey v. Hogg, 547 So.2d 498 (Ala.1989), for support for his position. In Bailey, this Court was called upon to decide whether the willful and intentional refusal to integrate a safety guard into existing machinery amounted to “removal” within the contemplation of § 25-5-11.
The facts of the Bailey case tended to show that the plaintiff’s employer had purchased a used concrete manufacturing plant from another party. The plant was delivered to the employer with a guard that would make certain pulleys and belts inaccessible. The defendant, Hogg, was a vice president of the employer and oversaw the assembly of the concrete plant. Hogg admitted that he knew that the machine was delivered with guards and that the guards were not installed, but stated that he did not know why the guards were not installed. In its analysis, this Court stated:
“The same dangers are present when an available safety guard is not installed as are present when the same guard has been removed. To say that an injury resulting from the willful and intentional removal of a safety guard is actionable but that an injury resulting from the willful and intentional failure to install the same guard is not contravenes ... public policy. To hold that the willful and intentional failure to install an available safety guard is not actionable would allow supervisory employees to oversee assembly of new machinery, instruct their employees not to install the safety guards, and then, when an employee is injured due to the lack of a safety guard, claim immunity from suit.”
Bailey, 547 So.2d at 500.
We believe that Bailey is distinguishable from the instant case. In Bailey, the defendant oversaw the assembly of the machine and knew that the safety guards had not been installed, and yet did nothing about it until an employee was injured because a guard was missing. In the instant case, the defendant, Harkins, allegedly oversaw the daily operations of the scarfing yard and allegedly was aware that various of his charges were disabling the oxygen flow lever. Yet, there is evidence to indicate that Harkins did nothing about it until Sharit was injured. The critical distinction between Bailey and the present case is that in Bailey the defendant was provided with guards that were a part of the equipment delivered with the machine and the defendant failed to put those guards in place. That simply is not the case before us. Sharit alleges that this defendant willfully disabled a safety device that was already in place on the equipment and had not been removed. We believe that the evidence establishes at most that Harkins failed to correct a possibly unsafe practice of some of his employees.
In Reed v. Brunson, 527 So.2d 102 (Ala.1988), this Court stated:
“Section 25-5-ll(c) clearly defines ‘willful conduct’ in terms of a ‘purpose or intent or design to injure another.’ The plaintiff need not show that the co-em *879 ployee defendant specifically intended to injure the person who was injured. What must be shown, however, is that the co-employee defendant set out purposefully, intentionally, or by design to injure someone, and that his actions in furtherance of that purpose, intent, or design, resulted in, or proximately caused, the injury or death upon which suit was brought. In defining ‘willful conduct’ in these terms, the Legislature recognized the clear distinction that has developed in Alabama between ‘wanton conduct’ and ‘willful conduct':
“ ‘ “Wantonness” is the conscious doing of some act or the omission of some duty under knowledge of existing conditions [while] conscious that from the doing of such act or omission of such duty injury will likely or probably result.
“ ‘ “Willfulness” is the conscious doing of some act or omission of some duty under knowledge of existing conditions accompanied with a design or purpose to inflict injury.
“ ‘Therefore, in “wanton conduct” and “wanton injury” a purpose or intent or design to injure is not an ingredient; and where a person from his knowledge of existing conditions and circumstances is conscious that his conduct will probably result in injury, yet, with reckless indifference or disregard of the natural or probable consequences, but without having an intent or design to injure, he does the act, or fails to act, he would be guilty of wantonness, but not of willfulness.
“ ‘But, in “wilful conduct” and “wilful injury” a purpose or intent or design to injure is an ingredient; and where a person, with knowledge of the danger or peril to another consciously pursues a course of conduct with a design, intent, and purpose of inflicting injury, then he is guilty of wilfulness.’
“Alabama Pattern Jury Instructions: Civil 29.01 1974)....”
Reed, supra, at 119-20.
Reed involved the removal of a guard from a machine for maintenance purposes, and the subsequent negligent or wanton failure to replace the guard. The failure to replace the guard was not found to be the result of an intent or design to injure anyone. Id. at 120.
Moreover, this Court has recently held that the “pinning” of certain safety devices with the knowledge of supervisory personnel does not amount to “willful conduct” as that term is defined in Code 1975, § 25-5-11(c). In Bean v. Craig, 557 So.2d 1249 (Ala.1990) this Court was confronted with a case strikingly similar to this one. The facts in Bean tended to show that the plaintiff was working under an automobile lift at the time of the accident. The lift required that the operator place a “safety pin” in a certain slot to ensure that the lift would not unexpectedly descend upon a workman thereunder. In that case the defendant allegedly allowed the plaintiff to place a “tire iron” in the slot where the safety pin should be inserted. The plaintiff alleged that this practice amounted to the removal of a safety device under § 25-5-11(c). This Court disagreed, stating:
“Despite the fact that Craig was aware of a risk in operating the lift, this evidence tends to prove only negligent, and not willful, conduct. The legislature, in recognizing the difference between negligent and willful actions, sought to ensure that eases of this type would not be submitted to a jury without some evidence showing either: (1) the reason why the co-employee would want to intentionally injure the plaintiff or someone else, or (2) that a reasonable person in the position of the defendant would have known that a particular result was substantially certain to follow from his actions. An employee may be liable for injuries sustained by a fellow employee only when such injury is caused by the offending employee’s willful conduct.” (Citations omitted.)
Bean, supra, at 1252.
We find, based upon our review of the same evidence considered by the trial court on the motion for summary judgment, that the summary judgment was properly en *880 tered. Chiniche v. Smith, 374 So.2d 872 (Ala.1979); Folmar v. Montgomery Fair Co., 293 Ala. 686, 309 So.2d 818 (1975). At most, the plaintiff’s evidence tends to indicate that Harkins may have been aware that the practice of pinning the oxygen control lever in the open position might pose some risk to the safety of the scar-fers. However, we find a total absence of any evidence tending to indicate either that Harkins had a motive to injure the plaintiff or that he would have known that a certain result was substantially certain to follow from his failure to correct Sharit’s actions.
Therefore, we affirm the defendant’s summary judgment.
AFFIRMED.
MADDOX, ALMON, ADAMS and STEAGALL, JJ., concur.