MOORE, Judge.
Based on the alleged inadequacy of the damages awarded, Jack R. Bates II appeals from a judgment of the Dallas Circuit Court (“the trial court”), entered on a jury’s verdict, awarding him $10,000 on his claim against Robert Riley, his co-employee, asserting that Riley willfully and intentionally removed of a safety device from a machine, which removal resulted in injuries to Bates. Riley cross-appeals, asserting that the trial court erred in denying his motion for a judgment as a matter of law. Because we determine that Riley was entitled to a judgment as a matter of law, we reverse the trial court’s judgment.

Facts

The trial testimony reveals the following relevant facts. Riley testified[1] that, in April 2009, he was working for Dixie Pellets in Selma. Bates testified that he began working as a team leader for Dixie Pellets in August 2008 and that Riley was on his crew. Michael Holtzapfel, who had been an operations manager for Dixie Pellets, testified that, at the Dixie Pellets plant, wood chips were used to make pellets. According to Holtzapfel, the process at the plant incorporates the use of pocket feeders, which grind the chips and feed them into a hammer mill, and another series of grinders that grind the chips until *1227 they become really fine, almost powder-like, so that the chips can be compressed into pellets. Holtzapfel stated that the pocket feeders have magnets on them to prevent sparks caused by metal contacting metal because, he said, once the wood chips are finely ground, a spark could create a fire in the hammer mill that could lead to an explosion.
Riley testified that the magnets on the pocket feeders are cleaned “[m]aybe once a shift” and that the machines would also clog up sometimes two or three times a shift or more. Holtzapfel also testified that the machines clog routinely. He stated that Riley was experienced and good at cleaning the clogs and getting the machines running again. Ernest Shears, who had been both the safety director and a team leader for Dixie Pellets, testified that the Occupational Safety and Health Administration requires that, if you enter or break the plane of any moving equipment or remove a guard or go around, over, under, or through a guard, the machine has to be locked out and all the energy to the machine has to be cut off. According to Shears, to lock out and tag out a pocket feeder, an operation lock would be placed on the pocket feeder, the person who had locked the feeder would try to start the pocket feeder from any and every point from which it could be started, and, once the feeder was disabled from operation, the. person who had locked it out would place their personal lock on it; thus, only the person who had locked out the pocket feeder could unlock it. Shears testified that, to clean the magnets or to place your hand in the pocket feeders to clean a bad jam, the lockout/tagout procedure was required to be followed. Riley testified that a limit switch is a safety device on the “magnet door” of the pocket feeder that, when the magnet door is opened, falls and shuts down the machine. Holtzapfel also testified that, when the magnet is removed from the pocket feeder, the limit switch is “tripped” and the machine is deactivated.
Bates testified that, on April 23, 2009, he received a call on the radio that there was a “pluggage” above Hammer Mill 8; he stated that, when he arrived at the site of the apparent clog, he asked John Brunson, who was in the control room, to give him a readout of the amps on the hammer mill so that he could determine whether the pocket feeder was clogged. Bates testified that the readout had indicated that there was low amperage, so he did not think there was any throughput, which indicated to him there was a clog somewhere. Bates stated that he began banging on the side of the hopper and on the area above the pocket feeder with a piece of conduit, or metal electrical pipe, in hopes of dislodging the material and getting the flow going back through the pocket feeder. He testified that he contacted Brunson in the control room and told him to power down the hammer mill and that he then pulled the magnet door open and began using a piece of angle iron, which is larger and heavier than the conduit, to knock loose the material that was clogging the pocket feeder. Bates testified that he vaguely recalled that someone else had been in the area, but, he said, he had been focused on his work. According to Bates, the angle iron did not clear all the blockage, so he had set it out of the way and had stepped back to grab a piece of conduit. He testified that he began using the conduit to unplug the clog but that there was more material clogging the machine that he could not get to with the conduit. Bates stated that he then stuck his hand into the machine to knock the material out of the way and that, when he did so, the pocket feeder activated and pulled his right hand into the machine, causing him serious injuries.
Riley testified that the pocket feeder had already been shut off by the time he *1228 arrived to help Bates unclog the machine and that he and Bates had opened the magnet door together. He testified that, when they opened the magnet door, he had held the limit switch, which is mounted to the side of the casing of the pocket feeder, to keep the machine from shutting off while they unclogged it because, he said, if the soft-start motor on the hammer mill is shut down, the process to restart it sometimes takes 20 or 30 minutes and, on the day of the accident, they had been pressed for production at the plant. Riley testified that, before Bates’s accident, he had held the limit switch while unclogging machines as often as once a day. Riley testified that he and Bates worked to' unplug the clog for approximately 15 to 20 ininutes and that, during that time, he had continued to hold up the limit switch to prevent the hammer mill from shutting down completely. Riley stated that he had thought that he and Bates were finished cleaning the clog when he saw Bates step back to put his angle iron down and that, at that time, he had called the control room on his radio to request a “bump,” which is a quick start and stop from the control room that is used to jolt the machine to try to break the clogged material free. According to Riley, after he called for the bump, Bates placed his hand inside the machine and the machine activated, causing severe injuries to Bates’s hand.

Procedural History

On March 17, 2010, Bates filed a complaint against Riley,[2] alleging that Riley had caused his injuries by willfully and intentionally removing a safety device. Riley filed an answer on April 14, 2010, denying the allegations in Bates’s complaint. A trial was held on December 5-8, 2011. At the close of Bates’s evidence, Riley made an oral motion for a judgment as a matter of law; the trial court denied that motion. At the close of all of the evidence, Riley renewed his motion for a judgment as a matter of law and Bates moved for a judgment as a matter of law as well; the trial court denied both motions. Following the trial, the trial court entered a judgment on the jury’s verdict, finding in favor of Bates and awarding him damages in the amount of $10,000. On December 20, 2011, Bates filed a motion for a new trial, attacking the sufficiency of the damages award. On January 3, 2012, Riley filed an opposition to Bates’s motion for a new trial. On March 18, 2012, the trial court entered an order denying Bates’s motion for a new trial. Bates filed his notice of appeal to the Alabama Supreme Court on April 27, 2012, and Riley filed his notice of a cross-appeal to the Alabama Supreme Court on May 8, 2012. The supreme court transferred both the appeal and the cross-appeal to,this court, pursuant to § 12-2-7(6), Ala.Code 1975.

Discussion

Bates argues on appeal that the trial court erred in denying his motion for a new trial because, he says, the amount of damages awarded by the jury-was inadequate. In his cross-appeal, Riley argues that the trial court erred in denying his motion for a judgment as a matter of law because, he says, Bates failed to prove each of the elements of § 25 — 5—11(c)(2), Ala.Code 1975. We first address the merits of the cross-appeal.
“In Delchamps, Inc. v. Bryant, 738 So.2d 824 (Ala.1999), our supreme court explained the standard of review applicable to a trial court’s ruling on a motion for a judgment as a matter of law:
“ ‘When reviewing a ruling on a motion for a [judgment as a matter of *1229 law (“JML”) ], this Court uses the same standard the trial court used initially in granting or denying a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 8 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). For actions filed after June 11, 1987, the nonmovant must present “substantial evidence” in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Motion Industries, Inc. v. Pate, 678 So.2d 724 (Ala.1996). Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).’
“738 So.2d at 830-31.”
Leonard v. Cunningham, 4 So.3d 1181, 1184 (Ala.Civ.App.2008).
Section 25-5-11, Ala.Code 1975, a part of the Workers’ Compensation Act, § 25-5-1 et seq., Ala.Code 1975, addresses actions against third parties for employment-related injuries resulting from willful conduct; “willful conduct” includes
“[t]he willful and intentional removal from a machine of a safety guard or safety device provided by the manufacturer of the machine with knowledge that injury or death would likely or probably result from the removal; provided, however, that removal of a guard or device shall not be willful conduct unless the removal did, in fact, increase the danger in the use of the machine and was not done for the purpose of repair of the machine or was not part of an improvement or modification of the machine which rendered the safety device unnecessary or ineffective.”
Ala.Code 1975, § 25-5-11(c)(2).
In Harris v. Gill, 585 So.2d 831, 835 (Ala.1991), the Alabama Supreme Court outlined the following four elements that must be met to make a prima facie case under § 25-5-11(c)(2):
“1. The safety guard or device must have been provided by the manufacturer of the machine;
“2. The safety guard or device must have been removed from the machine;
“3. The removal of the safety guard or device must have occurred with knowledge that injury would probably or likely result from that removal; and
“4. The removal of the safety guard or device must not have been part of a modification or an improvement that rendered the safety guard or device unnecessary or ineffective.”
Riley argues that, because the limit switch was never physically removed from the pocket feeder and its functionality was unaffected, the second element outlined in Harris was not met and, therefore, as a matter of law, he is not liable under § 25-5-11(0(2).
In Bailey v. Hogg, 547 So.2d 498, 499 (Ala.1989), a worker’s thumb was caught between a belt and a pulley on a machine; his thumb was amputated in the.accident. *1230 The worker’s employer had received with the machine a guard that would have covered the pulley, but the guard had not been installed. Id. at 499. In holding that the willful failure to install the safety guard equated to the removal of the safety guard pursuant to § 25 — 5—11 (c)(2), the Alabama Supreme Court stated:
“By making the willful and intentional removal of a safety guard the basis for a cause of action without the higher burden of proof of ‘intent to injure’ found in subsection [25 — 5—1 l](a), the legislature acknowledged the important public policy of promoting safety in the workplace and the importance of such guards in providing such safety. The same dangers are present when an available safety guard is not installed as are present when the same guard has been removed. To say that an injury resulting from the willful and intentional removal of a safety guard is actionable but that an injury resulting from the willful and intentional failure to install the same guard is not contravenes that important public policy. To hold that the willful and intentional failure to install an available safety guard is not actionable would allow supervisory employees to oversee assembly of new machinery, instruct their employees not to install the safety guards, and then, when an employee is injured due to the lack of a safety guard, claim immunity from suit.”
Id. at 499-500.
Relying on the reasoning in Bailey, the supreme court held in Harris, supra, that the “removal” of a safety device occurs when a machine is permanently altered to bypass that device and render it ineffective for its safety purposes. See also Cunningham v. Stern, 628 So.2d 576 (Ala.1993) (co-employees who allowed worker to operate press that had been modified to bypass palm-control buttons were not entitled to summary judgment since the act of bypassing safety device constituted removal of safety device for purposes of § 25-5-11(c)(2)). In Haddock v. Multivac, Inc., 703 So.2d 969, 970-72 (Ala.Civ.App.1996), an employee was injured when his hand was caught in the “forming die” of a machine; the safety guard that covered the forming-die area had been disengaged, or bypassed, by a jumper wire. If the guard had been working properly, the machine would have shut down if the guard was removed. Id. at 972. This court decided in Haddock that a genuine issue of material fact existed regarding the employee’s claim under § 25 — 5—11(c)(2), and we reversed the lower court’s summary judgment on that claim. Id.
Citing Haddock, Bates argues that the “bypass” of the safety device by Riley falls within the definition of removal under § 25 — 5—11(c)(2). We disagree. Although Riley held down the limit switch, the safety device designed to prevent the pocket feeder from running while the magnet door was open, Riley did not “bypass” that safety device within the meaning of Harris, Cunningham, or Haddock. In all of those cases, the co-employee had redesigned the machine at issue so as to render the safety device completely ineffective, essentially removing the safety device from the machine. In this case, the limit switch remained operational at all times; Riley simply held it up to keep the machine from shutting off. In Hallmark v. Duke, 624 So.2d 1058 (Ala.1993), the supreme court held that, assuming certain lids and valves on a machine could be considered safety devices, the defendant co-employees could not be liable under § 25—5—11 (c) (2) when those devices had not been bypassed to prevent their proper functioning and remained fully operational at the time of the accident; they simply had not been used by the defendant co-employees.
Likewise, in Sharit v. Harkins, 564 So.2d 876, 877 (Ala.1990), an employee was *1231 required to use an oxygen-natural gas torch in removing defects from large steel slabs produced at his employer’s steel plant. The torch had separate controls for the flows of oxygen and natural gas to the nozzle and another control, a lever, that released oxygen under 150 pounds of pressure to the nozzle; the high-pressure oxygen is what actually cut the metal. Id. On the date of the accident that occurred in that case, the employee had “pinned” the oxygen-control lever in the “open” position, causing a constant flow of oxygen under 150 pounds of pressure to the torch nozzle. Id. While working, the employee dropped the torch; the flow of oxygen caused the torch to “ ‘snake around’ much like an unattended water hose under high pressure,” injuring the employee, until he was able to grab the torch and remove the pin from the oxygen-control lever. Id. The employee sued his co-employee, asserting that the oxygen-control lever constituted a safety device and that the co-employee had willfully allowed that device to be disengaged or made inoperable. Id. at 878. In distinguishing Sharit from Bal-ley, the Alabama Supreme Court stated:
“The critical distinction between Bailey [v. Hogg, 547 So.2d 498 (Ala.1989),] and the present case is that in Bailey the defendant was provided with guards that were a part of the equipment delivered with the machine and the defendant failed to put those guards in place. That simply is not the case before us. [The employee] alleges that [the co-employee] willfully disabled a safety device that was already in place on the equipment and had not been removed. We believe that the evidence establishes at most that [the co-employee] failed to correct a possibly unsafe practice of some of his employees.”
564 So.2d at 878.
The circumstances in the present case are more akin to those in Sharit than those in Harris, Cunningham, and Haddock. Like in Sharit, Riley participated in the unsafe practice of manually and temporarily disabling the limit switch for a limited time while his task was being performed. We decline to expand the holdings in Harris, Haddock, and Bailey to include the temporary, manual disabling of a safety device that otherwise remains attached to the machine and operates as it was designed to perform. To do so would improperly expand the meaning of § 25-5-11(c)(2) to encompass something other than “removal.”
Because Bates failed to present substantial evidence creating a factual dispute as to whether Riley had “removed” a safety device, which action resulted in Bates’s injury, we conclude that the trial court erred in denying Riley’s motion for a judgment as a matter of law. We, therefore, reverse the trial court’s judgment on the jury’s verdict, and we remand the cause for the entry of a judgment consistent with this opinion. Because of our disposition of the cross-appeal, we need not discuss the merits of Bates’s arguments on appeal.
REVERSED AND REMANDED WITH INSTRUCTIONS.
PITTMAN and DONALDSON, JJ., concur.
THOMAS, J., concurs in the result, with writing, which THOMPSON, P.J., joins.

. Excerpts of Riley's video-deposition testimony were played before the jury. Following the close of Bates’s case-in-chief, Riley also testified at the trial. We have cited his testimony from the video deposition and from the trial interchangeably to the extent that the testimony is consistent.

. Although Bates had originally named additional defendants in his complaint, those defendants were later dismissed on Bates’s motion.