# IN THE SUPREME COURT OF IOWA

No. 16–0918

Filed December 16, 2016

Amended March 23, 2017

**IN THE INTEREST OF C.F.-H.,**

Minor Child,

**C.H.,** Father,

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for O'Brien County, David C. Larson, District Associate Judge.

A father appeals the termination of his parental rights. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED.**

Jared R. Weber, Orange City, for appellant.

Thomas J. Miller, Attorney General, Kathryn K. Lang, Assistant Attorney General, and Lori Kolpin, Assistant County Attorney, for appellee.

Tisha M. Halverson of Klay, Veldhuizen, Bindner, DeJong, Halverson & Winterfeld, PLC, Paullina, for minor child.

**APPEL, Justice.**

In this case, we are asked to consider when a child has been "removed from the physical care" of parents for at least twelve of the last eighteen months, thereby establishing a necessary element for termination of parental rights under Iowa Code section 232.116(1)(*e*) and (*f*) (2015). According to the parties on appeal, the father at no time had actual physical custody of the child. Nonetheless, the district court determined that for purposes of the statute, the child should be considered "removed" from the father's physical care for the requisite time period to support a termination of parental rights. The father appealed and we transferred the case to the court of appeals. The court of appeals affirmed. We granted further review. For the reasons expressed below, we vacate the decision of the court of appeals and reverse the district court.

## I. Factual and Procedural Background.

The child in this case, C.F.-H., was born in 2007. The mother and father were never married. Prior to November 2012, no custodial order existed for C.F.-H.

In 2011, the Iowa Department of Human Services (DHS) investigated an incident of domestic violence involving the mother and the father. As a result of the investigation, DHS made a founded child abuse assessment against the father. The parents participated in voluntary services after which the case was closed in June 2012.

In August, DHS investigated a second incident of domestic violence involving the parents. This time, the investigation resulted in DHS making a founded child abuse assessment against both parents.

In November, the juvenile court adjudicated C.F.-H. a child in need of assistance under Iowa Code section 232.2(6)(*c*)(1) (2011), concluding

that C.F.-H. was suffering or imminently likely to suffer harmful effects as a result of mental injury caused by the acts of C.F.-H.'s parents.

The district court agreed that C.F.-H. was a child in need of assistance on November 30, 2012. The district court order placed C.F.-H. in the physical custody of the mother under the supervision of DHS and granted the father visitation rights at the discretion of DHS. In December, the district court continued custody of the child with the mother with visitation for the father.

In June 2013, the mother moved for concurrent jurisdiction in order to obtain a permanent custodial order with respect to C.F.-H. The juvenile court granted the motion. On June 23, 2014, the district court ordered temporary joint legal custody of C.F.-H. On March 4, 2015, the district court entered a final decree of custody, granting joint legal custody to both parents. Primary physical care was placed with the mother and visitation with the father.

In a report filed on August 10, DHS filed a request to dismiss further juvenile court proceedings. DHS later rescinded the recommendation, however, but the father moved the district court to dismiss the proceedings. The juvenile court denied the dismissal on October 9.

In February 2016, DHS filed a petition to terminate the father's parental rights. After a hearing, the district court entered an order terminating the father's parental rights under Iowa Code section 232.116(1)(*e*) and (*f*) (2015).[1]

---

[1]At the hearing, the State also argued for termination of the father's parental rights under Iowa Code sections 232.116(1)(*b*), 232.116(1)(*d*), and 232.116(l)(*l*). The district court held there was no clear and convincing evidence that the child had been abandoned or deserted under Iowa Code section 232.116(1)(*b*). The district court also concluded that because there was no finding the child was physically or sexually abused or neglected, Iowa Code section 232.116(1)(*d*) was inapplicable. Finally, the

The father appealed, raising three issues. First, the father argued that because physical custody of the child had never been "removed" from him, the district court erred in granting termination of his parental rights under section 232.116(1)(*e*) and (*f*). Second, the father argued that the district court failed to consider the best interest of the child. Third, the father challenged admission of a therapist report.

The court of appeals affirmed the district court. The father sought further review, which we granted. For the reasons expressed below, we now reverse the decision of the district court.

**II.  Standard of Review.**

We review issues of statutory construction for correction of errors at law. *In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014); *In re G.J.A.*, 547 N.W.2d 3, 5 (Iowa 1996). We are required to construe provisions in Iowa Code chapter 232 liberally "to the end that each child under the jurisdiction of the court shall receive, preferably in the child's own home, the care, guidance and control that will best serve the child's welfare and the best interest of the state." Iowa Code § 232.1; *In re A.M.*, 856 N.W.2d 365, 373 (Iowa 2014).

**III.  Discussion.**

**A.  Relevant Statutory Provisions.** We begin with a review of the relevant statutory provisions. Chapter 232 of the Iowa Code is a comprehensive chapter which generally addresses juvenile justice. This case involves the potential relationship between statutory provisions related to removal and statutory provisions related to termination of

_____

district court found there was insufficient evidence in the record to support a finding of a severe substance-related disorder and that, as a result, termination could not be based on Iowa Code section 232.116(1)(*l*). On appeal, the State does not challenge these rulings of the district court.

parental rights. Therefore, we review the statutory provisions related to removal and termination in some detail.

1. *Provisions related to removal.* Chapter 232 contains four provisions relating to removal of the child from the home. The first provision involves removal of the child prior to court intervention under certain extraordinary situations. Iowa Code § 232.79. The second section relates to temporary removal before or after the filing of a petition on an ex parte basis. *Id.* § 232.78. A third section authorizes the removal of the child from the home after the filing of a petition but prior to a determination of whether a juvenile is a child in need of assistance. *Id.* § 232.95. A fourth section relates to removal of the child from the home upon an adjudication that the juvenile is a child in need of assistance (CINA). *Id.* § 232.96.

Iowa Code section 232.79 authorizes peace officers, juvenile court officers, and physicians to take a child into custody when there is imminent danger to the child and when there is not enough time to apply for a court order under Iowa Code section 232.78. A person authorized to remove the child must immediately orally inform the court of the emergency removal and follow up with a written explanation of the emergency removal and the circumstances surrounding the removal. *Id.* § 232.79(2)(*d*). Upon being notified of the emergency removal, the court is required to direct DHS or the juvenile probation department to make every effort to communicate with the child's parents. *Id.* § 232.79(4)(*a*). After the court is informed of an emergency removal, the court may enter an ex parte order pursuant to Iowa Code section 232.78. *Id.* § 232.79(4)(*c*).

Iowa Code section 232.78 authorizes the juvenile court to enter an ex parte order directing a peace officer or juvenile court officer to take

custody of a child before the filing of a CINA petition. Before an ex parte order may be issued, it must generally be demonstrated that the person responsible for the care of the child is absent, or though present, was asked and refused to consent to the removal of the child. *Id.* § 232.78(1)(*a*). Ex parte removal may occur only when it appears that "the child's immediate removal is necessary to avoid imminent danger to the child's life and health." *Id.* § 232.78(1)(*b*).

Any order entered under Iowa Code section 232.78 must include findings on a case-by-case basis unless imminent danger exists at the time of the court's consideration. *Id.* § 232.78(7)(*a*). The ex parte removal order is further required to include "[a] statement informing the child's parent that the consequences of a permanent removal may include termination of the parent's rights with respect to the child." *Id.* § 232.78(7)(*b*).

Iowa Code section 232.95 provides for hearings concerning temporary removal of a child from the home after a CINA petition is filed but prior to adjudication. After a section 232.87 petition to determine whether a child is in need of assistance has been filed, the court on its own motion or any person entitled to file a CINA petition may seek a hearing to determine whether the child should be temporarily removed from the home. *Id.* § 232.95(1).

Upon a hearing, the court may remove the child from the home. *Id.* § 232.95(2)(*a*). If a child is removed from the home, the juvenile court is required to make "a determination that continuation of the child in the child's home would be contrary to the welfare of the child" and that reasonable efforts have been made "to prevent or eliminate the need for removal of the child from the child's home." *Id.* § 232.95(2)(*a*)(1).

The juvenile court is generally required to make removal determinations on a case-by-case basis, with the grounds explicitly documented and stated in the court's order. *Id.* § 232.95(2)(*a*)(2). An exception to these requirements is provided for cases in which there is imminent danger to the child's life or health. *Id.* If a child is removed from the home, the court order "shall . . . include a statement informing the child's parent that the consequences of a permanent removal may include termination of the parent's rights with respect to the child." *Id.* § 232.95(2)(*a*)(3).

Iowa Code section 232.96 relates to removal of the child from the home as a result of a CINA adjudication. If the court enters an order adjudicating the child to be a child in need of assistance, the juvenile court, if it has not previously done so, "may issue an order authorizing temporary removal of the child from the child's home" as provided in section 232.95(2). *Id.* § 232.96(10). As under provisions relating to temporary removal after the filing of a petition, the court order is required to include a determination that continuation of the child in the child's home would be contrary to the welfare of the child and that reasonable efforts have been made "to prevent or eliminate the need for removal of the child from the child's home." *Id.* § 232.96(10)(*a*).

Similarly, the juvenile court is required to make findings on a case-by-case basis with the exception of situations involving a threat of imminent harm to the child. *Id.* As with temporary removal orders following the filing of a petition under Iowa Code section 232.95, an order that removes the child from the home is required to include "[a] statement informing the child's parent that the consequences of a permanent removal may include termination of the parent's rights with respect to the child." *Id.* § 232.96(10)(*b*).

2. *Provisions related to termination.* Iowa Code section 232.116 provides a framework for the termination of parental rights. Iowa Code section 232.116(1) lists the specific grounds for which the court may order a termination of parental rights. In terminating the father's parental rights in this case, the district court relied upon Iowa Code section 232.116(1)(*e*) and (*f*).

Iowa Code section 232.116(1)(*e*) provides that the court may terminate a parent's rights if the state proves as follows:

> (1) The child has been adjudicated a child in need of assistance pursuant to section 232.96.

> (2) The child has been *removed* from the physical custody of the child's parents for a period of at least six consecutive months.

> (3) There is clear and convincing evidence that the parents have not maintained significant and meaningful contact with the child during the previous six consecutive months and have made no reasonable efforts *to resume care of the child* despite being given the opportunity to do so.

(Emphasis added.)

Iowa Code section 232.116(1)(*f*) provides, in relevant part, that the court may terminate parental rights if the state proves as follows:

> (1) The child is four years of age or older.

> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.

> (3) The child has been *removed* from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.

> (4) There is clear and convincing evidence that at the present time the child *cannot be returned to the custody of the child's parents* as provided in section 232.102.

(Emphasis added.)

**B. Positions of the Parties.**

1. *The father.* The father argues that the district court erred in granting termination of parental rights under Iowa Code section 232.116(1)(*e*) and (*f*). The main thrust of the father's argument is that the term "removal" in both Code provisions requires a court order of removal under Iowa Code sections 232.78, 232.95, or 232.96. The father notes that at trial, the State conceded there was no such removal order against the father.

In addition, the father argues that in order for a child to be "removed from physical custody" of a parent, the parent must have physical custody before the removal occurred. Otherwise, physical custody has not been "removed" or "taken away" from the father.

In support of his argument, the father notes that under Iowa Code sections 232.78(7)(*b*), 232.95(2)(*a*)(3), and 232.96(10)(*b*), a parent is entitled to notice of the fact that the removal of the child could have impact on parental rights. The father argues that he at no time received such a notice. While the adjudicatory order entered on November 30, 2012, indicated that custody was placed with the mother, there was no warning under Iowa Code section 232.96(10)(*b*) in the order. The father does not attack the sufficiency of the adjudicatory order, but rather seeks to use the omission of notice as demonstrating that custody of the child has not been "removed" from him as required to support a termination under section 232.116(1)(*e*) or (*f*).

2. *The State.* The State responds by arguing that under Iowa Code section 232.116(1)(*e*) and (*f*) a formal "removal order" is not required. The State points out that custody of the child has always been with the mother. As a result, the child was "removed" from the physical custody of the father because he was never in the physical custody of the father.

**C. Analysis**. We begin our discussion with a review of the text of Iowa Code section 232.116(1)(*e*) and (*f*). Both subsections use the term "removed." As demonstrated in the overview of statutory provisions, derivatives of the word "remove" are used in the context of changes being made in physical custody of the child through court order or persons authorized to take emergency action throughout chapter 232. In the statute, the term "remove" and its derivatives—in the context of physical custody—invariably involves a dynamic change of circumstance, not stasis.

It is possible, perhaps, that we should approach "remove" differently in Iowa Code section 232.116(1)(*e*) and (*f*) than in the rest of chapter 232, but this would be an odd result. Ordinarily, we attempt to construe a term consistently throughout a statute. *See, e.g., State v. Paye*, 865 N.W.2d 1, 7 (Iowa 2015); *Carson v. Roediger*, 513 N.W.2d 713, 716 (Iowa 1994); *B.A.A. v. Chief Med. Officer*, 421 N.W.2d 118, 125 (Iowa 1988); *see also In re Lucinda R.*, 924 N.Y.S.2d 403, 410 (App. Div. 2011) (survey of statutory provisions within article shows word "remove" or "removed" is used in the context of the state's effectuation of removal of the child from the home).

Further, there is language in Iowa Code section 232.116(1)(*e*) and (*f*) that further supports a dynamic theory of the term "removed." The fourth requirement under Iowa Code section 232.116(1)(*e*) provides that the State must show the parent has not made reasonable efforts "to *resume* care of the child." Similarly, the fourth requirement of subsection (*f*) provides the State must show the child "cannot be *returned*" to the custody of the parents or parent. Iowa Code § 232.116(1)(*f*). The words "resume" and "returned" imply restoration of a previous custody situation. Here, however, the father never had

physical custody of the child, and under no circumstances would he "resume" physical care or would the child be "returned" to his custody. It is hard to equate "removal" with "absence" when the statute also requires a finding of whether the physical care may be "resumed" and custody "returned."

The notion of removal involving a change is not unknown in other areas of juvenile and family law. We have noted that under the Indian Child Welfare Act, Congress referred to the "removal" of Indian children from their families and placement of such children in foster and adoptive homes. *In re A.E.*, 572 N.W.2d 579, 582 (Iowa 1997). We have also made repeated reference to "removal" of children out of the jurisdiction in our caselaw. *See, e.g.*, *In re Marriage of Frederici*, 338 N.W.2d 156, 159 (Iowa 1983); *In re Marriage of Lower*, 269 N.W.2d 822, 825 (Iowa 1978); *Alex v. Alex*, 161 N.W.2d 192, 199 (Iowa 1968). We have referred to a custody decree prohibiting a parent without prior court approval to remove a child from one county to another. *Nesler v. Nesler*, 185 N.W.2d 799, 801 (Iowa 1971). We do not suggest that these usages necessarily determine the meaning of the term "remove" in the specific statutory provisions at issue here, but they do suggest that removal in the context of child welfare commonly involves a change in circumstance.

In fact, the notion of the term "remove" and its derivatives as involving a dynamic change in status is commonplace in the law. *See, e.g.*, *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1064 (9th Cir. 2014) (holding "remove" in statute means to transfer wild horses and burros from public lands on which they once lived to private lands, or the destruction of the animals); *E. Sav. Bank, FSB v. Estate of Kirk ex rel. Kirk*, 821 F. Supp. 2d 543, 545 (E.D.N.Y. 2011) (holding concept of "removal" is limited to the transfer of an action commenced in state court

to a federal court); *United States v. One 1942 Studebaker*, 59 F. Supp. 835, 838 (D. Del. 1945) (stating "removal" involves movement from one definite place to some other place); *Mack Fin. Corp. v. Rowe* (*In re Rowe)*, 145 B.R. 556, 559 (Bankr. N.D. Ohio 1992) (holding "removal" of assets involves actual or physical change in position or locality which results in depletion of bankruptcy estate); *Bates v. Riley*, 130 So. 3d 1225, 1231 (Ala. Civ. App. 2013) (finding switch not "removed" from machinery in tort case where coworker held switch to prevent machine from turning off); *Ventura Realty Co. v. Robinson*, 89 Cal. Rptr. 117, 122 (Ct. App. 1970) (holding a constitutional provision on "removal" of county seat means transfer of seat of government from town to town); *Widen v. County of Pike*, 932 N.E.2d 929, 936 (Ohio Ct. App. 2010) (stating failure to "remove" an obstruction to a public road means failure to move an obstruction already blocking highway); *Larson v. Bunch*, 255 P.2d 486, 488 (Okla. 1953) (holding "removal" means that councilman must be in actual residence of the ward from which he is selected and that his removal from ward shall cause a vacancy).

We do not suggest that these usages necessarily mandate an interpretation of the term "removal" under Iowa Code section 232.116(1)(*e*) and (*f*), but they do reflect ordinary usage of the term. When the legislature has not defined a term, we look to, among other tools, prior court decisions and common usage. *Kay-Decker v. Iowa State Bd. of Tax Review*, 857 N.W.2d 216, 223 (Iowa 2014).

Of course, when statutes are ambiguous, we will look further into the statute to seek the legislature's intent. *Id.* There is nothing in the context of Iowa Code chapter 232 that suggests we should construe the term "remove" as simply being absence of custody under Iowa Code section 232.116(1)(*e*) and (*f*). By construing "remove from physical

custody" to require a change from physical custody to lack of physical custody under chapter 232, the statute ensures that before termination occurs under these subsections, a parent has had a chance at physical custody in the past that has been unsuccessful.[2]

We understand the State's position is that mere absence of physical custody is sufficient to satisfy the "removed from physical custody" element for termination under section 232.116(1)(*e*) and (*f*). But many fathers, including those in military service, may be out of the country for extended periods of time and not have physical custody of a child for twelve months out of the previous eighteen months. Certainly such absence of physical custody would not provide the necessary predicate for a termination of parental rights under section 232.116(1)(*e*) and (*f*).

We have also examined the legislative history of the statute. Originally, Iowa Code section 232.116(1)(*e*) and (*f*) required the State to show that "[t]he custody of the child has been transferred from his or her parents for placement pursuant to section 232.102." Iowa Code § 232.114(4) (1979). This provision was amended in 1992 and the current language adopted. The fiscal note to the proposed amendment stated that the amendment "[c]hanges the requirements for termination of parental rights. The 6 month time period would start from the time the child is removed from the physical custody of the parents, not when legal custody is transferred." H.F. 2452, 74th G.A., 2d Sess. fiscal note (Iowa 1992).

---

[2]We express no view on the question of whether a removal of the child from one parent is sufficient to support termination of parental rights of a noncustodial parent.

The fiscal note suggests that the purpose of the amendment was merely to speed up the time frame for calculation of the required twelve months under Iowa Code section 232.116(1)(*e*) and (*f*). *See id.* No other substantive change is mentioned.

In conclusion, the language, context, policy considerations, and legislative history of the statute tend to cut against the notion that mere lack of physical custody is sufficient to satisfy the statutory requirement of "removal of physical custody."

The dissent argues that, in fact, physical custody was removed from the father and removal in fact for the required statutory period is sufficient to trigger the statute. On appeal, however, the State did not raise this issue.[3] The State on appeal conceded that "[C.F.-H.] always remained in the custody of the mother," that "[C.F.-H.] has never been in the father's physical custody," and that "[C.F.-H.] has always been 'removed' from the physical custody of the father, meaning he has never been in the father's physical custody." Although the dissent makes a plausible argument around the issue of whether C.F.-H. was, in fact, actually removed from physical care, any contention that C.F.-H. had been so removed from physical custody has not been preserved. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002).

In light of our disposition, we do not address the other arguments raised on appeal.

---

[3]"Physical care is the right and responsibility to maintain the principle home and provide routine care of the child." *In re Marriage of Stickle*, 408 N.W.2d 778, 780 (Iowa Ct. App. 1987). According to the CINA petition filed by the State in this matter on September 19, 2012, however, the father did not have a permanent address.

**IV. Conclusion.**

For the above reasons, the decision of the court of appeals is vacated and the judgment of the district court is reversed.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED.**

All justices concur except Mansfield, Waterman, and Zager, JJ., who dissent.

**MANSFIELD, Justice (dissenting).**

I respectfully dissent and would affirm termination of the father's parental rights. The court offers various tests for what "removed from the physical custody of the child's parent[]" means as used in Iowa Code section 232.116(1)(*e*)(2) and section 232.116(1)(*f*)(3) (2015). Boiled down, those tests require that there be a "dynamic change of circumstance, not stasis." I think the court's "dynamic change" test was easily satisfied under the facts of this case.

Here the father was living with both the mother and C.F.-H. until the fall of 2012. At that time, following the latest report of domestic violence and a report of possible drug use by the father, the Iowa Department of Human Services (DHS) initiated a safety plan that effectively removed the father from the family home. This alteration of status was confirmed in two court orders which gave "custody" of five-year-old C.F.-H. to the mother and provided that the father could only have "visitation . . . at the discretion of" DHS. Thereafter the father repeatedly refused services. C.F.-H. never resided with his father again until the father's parental rights were terminated in 2016. This case therefore meets *the majority's* standard for termination of parental rights. C.F.-H. had been taken away from the father's physical custody through a combination of actions by DHS and the juvenile court.

Additionally, the majority's test is incorrect. "Removed" is susceptible to two different interpretations. One requires physical separation of the child from the parent. (For example, "I am removed from these events.") The other requires physical separation plus some affirmative action that brought about the separation. While the latter is

the more common use of "removed," I believe the former test is the one the legislature intended and wrote into the statute in 1992.

Finally, I disagree with the majority's contention that the State waived any argument on appeal that the child had been "removed" from the father's custody. I do not believe such a waiver is even possible in a termination of parental rights case, and it certainly did not occur here.

**I. The Child Was "Removed" from the Father's Custody Even Under the Majority's Standard.**

I begin with a review of the factual record. The juvenile court made a finding that C.F.-H. *had* been removed from the father's custody. An examination of the record not only demonstrates the correctness of this finding, but also shows why this judge, who had presided over this case over its four-year progression from the beginning, correctly terminated the father's parental rights.

In November 2012, when C.F.-H. was five years old, he was adjudicated a child in need of assistance (CINA) after the father and mother physically assaulted each other in the family home and there were concerns the father was using methamphetamine.[4] This followed an earlier incident where the father had assaulted the mother. At the time of the second assault, the child was living with both parents, but they were behind on their bills and in danger of losing their housing.

The mother agreed to a DHS safety plan whereby the father would no longer be allowed in the home. The ensuing CINA order provided "[t]hat custody of [C.F.-H.] shall remain with his mother . . . subject to protective supervision being provided by the Iowa Department of Human Services" and "[t]hat visitation for [C.F.-H.] with his father . . . shall be at

---

[4]The father had prior convictions for methamphetamine possession.

the discretion of the Iowa Department of Human Services." The order also directed both parents to receive certain services. The father moved out of the home.

Three weeks later, a dispositional order was entered. The order reiterated that custody of C.F.-H. would remain with his mother subject to protective supervision from DHS and that the father would have visitation at the discretion of DHS. Again, the parents were directed to receive certain services.

The father did not cooperate in services for the most part. In 2013, he tested positive for methamphetamine and acknowledged ongoing methamphetamine use. After that, he refused drug testing. He never completed the required batterer's education program or went through the psychological evaluation ordered by the court.

In 2014, anticipating the completion of CINA proceedings, a district court entered a temporary custody order giving the mother primary physical care of C.F.-H. subject to supervised visitation by the father. Over the mother's objection, the parties were granted joint legal custody. The parties agreed to enter a permanent order along the same lines in early 2015. But the CINA proceedings never ended.

As the years passed, the mother had to obtain several no-contact orders against the father. These orders were based on ongoing threats relayed by phone, text, and email from the father to the mother. A number of those threats are in the record. In addition to outright threats, the father sent numerous messages that were highly profane, demeaning, and abusive to the mother and to the female DHS social worker assigned to the case.

After the fall of 2012, C.F.-H. never again resided with his father. While the boy was in his mother's care, he gradually improved. He had a

series of emotional and behavioral issues and received special education services at school, but he made progress.

During the four years from 2012 to 2016, the mother generally put her life in order. The father did not. The father's last unsupervised contact with C.F.-H. came approximately a year before the termination hearing. His last participation in a family meeting took place approximately eleven months before, at which the father "ended the meeting by calling [the mother] horrible names." The father also stopped showing up for counseling with C.F.-H., having walked out of the last meeting. The most recent visit or contact of any kind between the father and C.F.-H. occurred ten months before the termination hearing. In November 2015, C.F.-H.'s therapist wrote,

> Given [the father's] threats to [the mother] and her other son . . . ; his verbal and written disrespect to [the mother] and [the DHS social worker]; his refusal to follow DHS requirements for UAs and substance abuse treatment aftercare; and his continued alcohol and likely other mind-altering substance use; plus his history of domestic violence, I see little hope in this man making the needed changes to provide [C.F.-H.] with a safe, stable, nurturing environment during visitation.

The DHS social worker believed that the father was using drugs, noting his weight loss. So did the mother, noticing the father's agitated state and the metallic smell to his sweat. In December 2015, the father was arrested on a warrant and also charged with driving while under suspension. He did not have regular housing, having been kicked out of the accountability house where he was living due to concerns he had relapsed. The father testified on this subject at the termination hearing:

> Q. . . . Where do you live currently? A. I'm in between -- I've been in between places.

> Q. Okay. How long have you been in between places? A. Quite a while.

Q. Well, give me a time frame. What's quite a while?
A. Quite a while.

Q. Is that one month? Three months? Six months?
A. I gave you will the time frame. It's quite a while.

Q. Okay. And before your quite a while started, where did you live? A. With my son.

. . . .

Q. Okay. So if you had a visit with [C.F.-H.], where would that visit take place? A. Probably at my friend's house or at the mall, at a park, anywhere he wanted to go, the train museum.

Q. But you wouldn't have any place for him to sleep, would you? A. Sure.

Q. At the friend's house? A. There or at a hotel room.

Q. What's the friend's name? A. None of your business.

The termination hearing began on March 22, 2016. Fifteen minutes into the hearing, the father walked out of the courtroom, although he later returned to the courtroom to testify when the hearing resumed on April 1. During the intervening week between March 22 and April 1, the father texted a social worker as follows: "Tell that fat lying b____ [referring to the mother] [C.F.-H.] better answer his phone when I call she can have her UA [too] if I can use her mouth as a specimen cup." This text was made part of the record during the second day of the hearing.[5]

The State's last witness on the second day was a deputy sheriff who had been working in the courthouse. He testified that he detected an odor of alcohol coming from the father that day. He also had noticed a wet spot in the crotch of the father's pants that "sometimes can indicate somebody that is under a controlled substance or alcohol."

---

[5]I realize this message is very offensive but I quote it because it is representative of many other texts sent by the father and because it helps one understand the manner in which the father's harassment was undermining efforts to stabilize the child's life.

Throughout the hearing, the father remained openly defiant about not submitting to drug or alcohol testing. On this subject, the father testified,

> Q. Okay. You've been court-ordered to provide drug testing with the Court for a number -- I think from the beginning of -- A. Yes. And as I stated, give me a valid reason.
>
> Q. That what? A. I said give me a valid reason.
>
> Q. Well, I didn't -- I don't have to give you a valid reason. The Court ordered you to participate in drug testing. So the Court made a determination that you were to provide random drug and/or alcohol testing as requested by the Department of Human Services or a substance abuse treatment provider. A. And I said give me a valid reason.
>
> Q. So you're just choosing to ignore the Court's order? A. I'm choosing to say they need a valid reason to ask for one.

The other witnesses uniformly offered the opinion that termination of the father's parental rights would be in C.F.-H.'s best interests, even if it left him with only one parent. The DHS social worker testified,

> Q. And isn't it also true that since [C.F.-H.] has not had any contact with his father over the course of the last nine months, that his functioning has significantly improved in all aspects of his life, in academics and behaviorally in school, as well as at home? A. Correct.

The DHS social worker added, "I feel that after four and a half years together and the significant safety concerns that we have today, that that's really my only option, to recommend termination of parental rights." She also volunteered, "[T]here's a small portion of me that's kind of -- almost feels guilty that we've waited this long because [C.F.-H.] is the one emotionally that suffers through all of this."

Meanwhile, the mother testified,

> Q. Are you in support of [the father's] rights as to [C.F.-H.] being terminated? A. Yeah.

Q. You're going to lose out on child support. A. I don't care.

Q. Okay. You're also not going to have -- [C.F.-H.], like I said, he doesn't have another person to step in to be a dad to him. A. He hasn't for a long time.

Q. He's never had a dad? Is that your testimony? A. Not really. (Witness crying.)

Q. Okay. And what else can you tell us about [C.F.-H.]? Why is this important for [C.F.-H.] to have [the father] out of his life legally? A. I know [C.F.-H.] loves his dad and I know his dad loves him, but it's not fair to a child to have his dad come in and out of his life just when it's convenient for him. I was lucky my dad chose his children over the demons of -- of the demons from drugs and alcohol. I don't understand why it's this hard for [the father] to keep going back there.

I could go on but this is not a close case. The juvenile court's termination of the father's parental rights was clearly justified under Iowa Code section 232.116(1)(*e*) and (*f*).

The State proved C.F.-H. had been "removed" from the father's custody, even under the majority's interpretation of that requirement. In addition to the specific chronology recited above, we have the summary testimony of the DHS social worker:

Q. [A]t the time that the Department of Human Services became involved with this family in juvenile court, isn't it true that [the father and the mother] were living together with [C.F.-H.]? A. Correct.

Q. And subsequent to then juvenile court becoming involved, isn't it true that your recommendation to the Court was that custody of [C.F.-H.] be placed with [the mother] and not with [the father]? A. Correct.

Q. And [the father] subsequently then moved out of the family home; isn't that correct? A. Correct.

Q. Okay. And so in regards to the grounds of the termination petition, isn't it true that [C.F.-H.] has been removed from the physical custody of his father for the last 12 of the last 18 months? A. Correct.

Q. In fact, [the father] has never had physical custody of [C.F.-H.] since the Department of Human Services became involved in these proceedings; isn't that correct? A. Correct.

In short, once we examine the record, it becomes clear that the father is raising an academic point about the meaning of "removed" with no connection to the actual facts of this case. I do not fault the father's counsel for advancing this argument. Counsel has performed admirably despite having very little to work with. But I would affirm this termination and wait for another case where the meaning of "removed" matters.[6]

**II. In Any Event, the Majority's Interpretation of "Removed" Is Incorrect.**

Furthermore, I question whether the majority's standard is the right one. The full texts of Iowa Code section 232.116(1)(*e*)(2) and section 232.116(1)(*f*)(3) require that the child have been "removed from the physical custody of the child's parents for" a minimum period of time. *See* Iowa Code § 232.116(1)(*e*)–(*f*). It is sufficient that the child and the parent have been physically separated from each other, regardless of how that happened. The statute simply says "removed." It does not require that any entity such as DHS or the court have performed "a removal."

Also, the statute says "removed . . . for" a minimum period of time (which varies depending on whether subsection (*e*) or (*f*) is at issue). Even under a dynamic interpretation, there would be only one discrete act of removal. Therefore, references to "removed" followed by a time duration arguably support a static interpretation and suggest that the separation is what matters, not how it initially came about.

---

[6]The father also argues that the best interests of the child did not support termination and that the juvenile court erred in admitting therapist records. I agree with the juvenile court and the court of appeals that termination is in the best interests of the child. I also find clear and convincing evidence to support termination even without consideration of the therapist records, and even without considering whether they are covered by Iowa Code section 232.96(6). *See* Iowa Code § 232.96(6) (providing that certain reports and records are admissible in juvenile proceedings).

In 1992, the legislature amended Iowa Code section 232.116(1). *See* 1992 Iowa Acts ch. 1231, §§ 27–29 (codified at Iowa Code § 232.116(1) (1993)).  Previously, to prove grounds for termination under what are now sections 232.116(1)(*e*) and (*f*), the State had to show that "[t]he custody of the child has been transferred from the child's parents for placement pursuant to section 232.102 . . . ."  Iowa Code § 232.116(1)(*d*)–(*e*) (1991).  That requirement was left in place for some of the other sections, but the 1992 legislation struck it from subsections (*e*) and (*f*).  *Compare* Iowa Code § 232.116(1)(*i*)–(*k*) (1993), *with id.* § 232.116(1)(*d*)–(*e*), (*g*).  Thus, for termination of parental rights under subsections (*e*) and (*f*), something less than a dispositional order transferring legal custody of the child is required.  This tells me there should be a practical approach to the word "removed."  And under a practical approach, if (1) a child has been adjudicated in need of assistance, (2) the child has been out of the parent's care for the required period of time, (3) the parent—despite the provision of services—is incapable of caring for the child, and (4) termination is in the child's best interests, does it really matter how the whole proceeding started?

This case is a good illustration of that point.  C.F.-H. had been in CINA limbo for three-and-a-half years.  Time was clearly running out. *See* Iowa Code § 232.101(2) (2015) (stating that when the court after the dispositional hearing permits a parent to retain custody of the child under supervision, this order may not last longer than a year and may only be extended twice for up to one year each time).  The father was clearly an unfit parent and an obstacle to the child's well-being and successful emergence from CINA proceedings.  The father's status needed to be addressed before DHS could disengage itself from this case.

Another important reason for reading "removed" broadly is that we decided long ago to read "parents" broadly as including only one parent. The statute literally requires that "[t]he child has been removed from the physical custody of the child's *parents*." *Id.* § 232.116(1)(*e*)–(*f*) (emphasis added). If "parents" meant only *both parents,* then obviously the only way for neither parent to have custody would have been some kind of *movement* in the past by which the child and the parents were separated.

However, in 1992, after the legislature had amended the statute as noted above earlier in the year, we held that when a child is in the custody of one parent, the statutory provisions referring to "parents" could nonetheless be used to terminate the parental rights of *the noncustodial parent only*. *In re N.M.,* 491 N.W.2d 153, 156 (Iowa 1992). This rule is now firmly entrenched in our caselaw. *See, e.g., In re H.S.,* 805 N.W.2d 737, 749 (Iowa 2011). Once it is clear that just a single noncustodial parent's rights may be terminated, it makes no sense to draw lines over how that parent became a noncustodial parent, so long as the other requirements for termination have been met. In other words, the broad definition of "removed" works in tandem with our broad definition of "parent."[7]

The court expresses concern about an absent parent who may be in military service or just "out of the country." There are laws addressing the former situation. *See, e.g.,* 50 U.S.C. § 3932 (2012) (stay of

---

[7]Unfortunately, the majority opinion creates additional doubt when it leaves open the possibility in a footnote that even a "dynamic" removal from a custodial parent would be insufficient to meet the statutory removal requirement as to the *noncustodial* parent. Under this scenario, despite a CINA adjudication and a child's relocation from the custodial parent to foster care, the clock would not start running as to the noncustodial parent. I do not think the majority intends this result, but the reasoning in its opinion does not preclude it.

proceedings); Iowa Code § 29A.93 (stay of proceedings); *id.* § 232.116 (stating that the court need not terminate if the absence of a parent is "due to active service in the state or federal armed forces"). Otherwise, when a child has been adjudicated CINA and is being supervised by DHS, the parent should understand that the clock is running. Being "out of the country"—if the parent is not serving in the military—is not an adequate excuse for failing to address the serious parenting problems that led to the CINA adjudication in the first place.

Additionally, the court voices concern that a parent needs to have been "advised through the findings of judicial orders what the shortcomings of his or her parenting are." This of course will occur through the CINA process, and did occur here, *regardless* of the definition of "removed."

Further, the court indicates that every parent should get "a chance at physical custody" before losing parental rights. In my view, it depends on what one means by "a chance at physical custody." The very purpose of the CINA proceeding is to give the parents every chance to succeed. Here the father was given many such chances. He wasted them. Once a child has been adjudicated CINA, our juvenile laws do not guarantee— nor should they guarantee—that every parent will get a trial run at parenting on his or her own unilateral terms. Yet that is what this father wants and claims to be entitled to under the law.

I fear the majority's approach to this case will lead to a bleak and pointless outcome. The father will never be able to establish an appropriate relationship with C.F.-H., because he continues to refuse to address his drug and alcohol issues. DHS will need to stay involved indefinitely. No permanency will be achieved. And the mother, DHS, and service providers will continue to be subjected to unacceptable

verbal abuse that no judge or other employee of the Iowa Judicial Branch would tolerate in his or her line of work.

**III. The State Did Not Waive the Issue of Whether C.F.-H. Had Been Removed from His Father's Custody.**

As noted, the juvenile court made a finding below that C.F.-H. *had* been removed from his father's custody. The majority brushes past that finding, however. It faults the State for not defending that finding on appeal. In my view, the court misunderstands our role in termination-of-parental-rights appeals and also fails to put the State's appellate response in the proper context.

I agree that the State's response to the father's petition on appeal was inartful. Still, the State correctly pointed out that when the CINA petition was filed in the fall of 2012, the father had been living with the mother and C.F.-H. Thereafter, as part of a safety plan, the father was no longer allowed in the home. The State also acknowledged, "Throughout this case, [C.F.-H.] has never been in the father's physical custody." That statement was correct. Since this case was commenced by the filing of the CINA petition, C.F.-H. has not lived with his father.

True, the State later made an incorrect statement that C.F.-H. "has *never* been in the father's physical custody." (Emphasis added.) I suspect that the State either was trying to say that C.F.-H. had never lived with the father alone, or was pointing out there had not been an initial custody proceeding for C.F.-H., or simply made an error. Regardless, this does not mean we should close our eyes to the record in this case.

To begin with, the State did not have to file a response to the father's petition on appeal at all. The special rules governing expedited

CINA and termination-of-parental-rights appeals provide that any response to a petition on appeal is "optional." Iowa R. App. P. 6.202(1).

Also, unlike in a normal appeal, the parties usually do not have access to the transcript during the briefing process. For example, in this case, the transcript was filed in the district court on a Friday afternoon and the State submitted its response to the father's petition on appeal to our court the following Monday. I would presume the State had no opportunity to review the transcript before preparing its response.

Accordingly, we may affirm the juvenile court's order based on our independent review of the record, regardless of the content of the appellee's response. *See, e.g.*, *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) ("[W]e may affirm the juvenile court's termination order on any ground that we find supported by clear and convincing evidence."). In a termination-of-parental-rights case like this, where the State's appellate counsel may have fumbled the discussion of the record somewhat in its optional response, our job is to review the record independently and apply the law to it.

Also, in fairness to the State, the father was making a different argument in his petition on appeal than the court endorses today. The father argued on appeal that a formal removal order was necessary. The State's response was geared to that argument. Now, however, the majority determines that a de facto removal is sufficient, but it won't examine the record for evidence of a de facto removal. Instead, it relies on a purported concession by the State in the context of a different argument. I think that is unfair.

For all these reasons, I respectfully dissent and would affirm both the juvenile court and the court of appeals.

Waterman and Zager, JJ., join this dissent.