Rel: August 30, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## SPECIAL TERM, 2024

_____

### SC-2022-0736
_____

## Dean Leader and William Durall

## v.

## Crescencio Pablo, as the dependent spouse of Catalina Estillado (a/k/a Eva Saenz)

## Appeal from Jefferson Circuit Court
## (CV-17-903862)

MENDHEIM, Justice.

Catalina Estillado incurred injuries that caused her death as the result of a workplace accident that occurred in the course of her employment with ABC Polymer Industries, LLC ("ABC Polymer"). Crescencio Pablo, the surviving spouse of Estillado, initiated an action in the Jefferson Circuit Court ("the circuit court"), asserting, in addition to other claims that are not germane to this appeal, a wrongful-death claim based on § 25-5-11, Ala. Code 1975, against Estillado's coworkers, Dean Leader and William Durall, alleging that their willful conduct had caused Estillado's injuries. Specifically, Pablo alleged that Estillado's coworkers had removed a guard from the machine that caused Estillado's injuries. Following a bench trial, the circuit court entered a judgment against Leader and Durall and in favor of Pablo in the amount of $3 million. Leader and Durall appealed.

<u>Facts and Procedural History</u>

Estillado was an employee of ABC Polymer. ABC Polymer uses numerous extruder machines to manufacture "extruded polypropylene products" at a plant located in Helena. In ABC Polymer's plant, there are multiple "lines" of equipment composed of, among other things,

2

"godets," which are groupings of industrial rollers. On August 16, 2017, Estillado was working at ABC Polymer's plant on "Line 3" at "Godet 1" when she was "caught in the rolls and material web … while the line was producing a fibrillated polypropylene fiber …." Estillado was working alone at the time of the accident; "there were no eye witnesses or video of the accident." A report created by the United States Department of Labor's Occupational Safety and Health Administration ("OSHA") during the course of its investigation of the accident indicates that Estillado

> "was most likely cutting or about to cut a wrap on the bottom roll at Godet 1 with a utility knife and/or scissors. A wrap occurs when the strands of the web break and the material wraps around or balls up on a roll. The employer trained and expected the employees to cut a wrap from the roll while the line was operating to prevent it from becoming too big and requiring the line to be shut down."

The cause of Estillado's death, as stated in the OSHA report, was determined "to be multiple blunt force injuries to the head, neck, torso and extremities."

Line 3, including Godet 1, was manufactured in 1989 by Faré, S.p.A. ("Faré"), an Italian company that manufactures extruder machines. Faré manufactured Godet 1 with various guards to protect the operator of the machine from injury while the machine is in use. Marco

Faré ("Marco"), a mechanical engineer, works for Faré as its special purchaser. Marco's deposition testimony, which was read into the record during the course of the bench trial below, indicated that Marco was familiar with Line 3 and had knowledge of how it was designed and manufactured in 1989. Marco testified that Line 3 was manufactured with a "security gate or safety gate" on Godet 1 that, Marco confirmed, as originally designed and manufactured, "electronically interlocked with a limit switch." Marco explained the operation of the security gate as follows:

> "[Pablo's trial attorney:] And this machine as designed and manufactured included a [security gate] that was electronically interlocked?
>
> "[Marco:] Yes. Correct.
>
> "[Pablo's trial attorney:] How did the [security gate] that was electronically interlocked work? How was it intended to work?
>
> "[Marco:] It has a base, a steel plate, that if removed, activates a microswitch which activates a circuit, a safety circuit.
>
> "[Pablo's trial attorney:] And how does that affect the rollers?
>
> "[Marco:] The machine, in order to function, needs to be fed with a plastic film, and for this reason, the gate can be lifted. In this operation, the operator inserts the film in front

4

of the machine, in front of the rollers. Obviously, this operation has to be executed at low speed, and this is to be able to make the machine work. For this reason, when the gate is lifted, it immediately lowers the speed to reduce speed. It's called a slowdown.

"....

"[Pablo's trial attorney:] So the lifting of the gate and the safety feature you described would slow down the rollers?

"[Marco:] Yes. Instantly.

"[Pablo's trial attorney:] And make the -- and thereby, make the machines and the rollers more safe?

"[Marco:] Absolutely, yes.

"....

"[Pablo's trial attorney:] … Can you describe for us how the security gate would be interlocked with th[e] switch and how the safety feature works?

"[Marco:] The limit switch … is activated by a metal plate that's soldered, or welded, with the arm with the [security] gate. As soon as the gate is moved for any reason, the switch intervenes, and then the security circuit activates slowdown mode.

"....

"[Pablo's trial attorney:] So that if the gate is lowered, the rollers can turn at production speed?

"[Marco:] Yes. …

"....

5

"[Pablo's trial attorney:] Is it fair to say that if this switch is removed from the machine, it becomes unreasonably dangerous for the operator?

"[Marco:] Yes, that's correct."

Marco also confirmed that it is "necessary that the rollers [in Godet 1] be guarded when the machine is in production" and that, "if the rollers are not guarded as designed and manufactured by Faré," then Line 3 "becomes unreasonably dangerous." Marco answered in the affirmative when asked the following question: "If the machine we've been discussing as designed and manufactured by Faré had been installed with all safety features working, is it true that the operator would have been unable to open the [security gate] and cut wraps at production speed?"

In his deposition testimony, Marco also discussed the electrical schematic diagrams for Line 3, which were submitted into evidence as Plaintiff's Exhibits 6 and 7. In discussing Plaintiff's Exhibit 6, Marco stated:

"[Pablo's trial attorney:] What are we looking at?

"[Marco:] This is of the circuit called emergency chains.

"[Pablo's trial attorney:] Is this an electrical schematics dealing with the control circuits for these safety features?

"[Marco:] Yes.

6

"....

"[Pablo's trial attorney:] Does this drawing show how the limit switch for the security gate [on Godet 1] is wired?

"[Marco:] Yes.

"....

"[Pablo's trial attorney:] And is it fair to say that Faré has had possession of this electrical schematic since the date this machine was manufactured?

"[Marco:] Correct.

"[Pablo's trial attorney:] And it would have been available to ABC Polymer or Mr. Durall had they requested it?

"[Marco:] Yes."

Concerning Plaintiff's Exhibit 7, Marco stated:

"[Pablo's trial attorney:] Can you tell us what it shows?

"[Marco:] This is the slowdown circuit, emergency.

"....

"[Marco:] This design shows the position of the switches on the line group and the switches of the security gate. As you can note, there's the first godet gate, second godet gate, and hot rolls gate. These are the security gates on the line, and what we previously described as the switch is connected to the security gate.

"[Pablo's trial attorney:] This drawing would allow the machine to slow down the rollers when the gate was lifted?

"[Marco:] Correct.

"....

"[Pablo's trial attorney:] And this drawing was also maintained by Faré since the date this machine was manufactured?

"[Marco:] Correct.

"[Pablo's trial attorney:] And would have been available to ABC Polymer or Mr. Durall had they requested it?

"[Marco:] Yes."

Marco's deposition testimony indicated that the electrical schematic diagrams were given to the original purchaser of Line 3, which was a company located in Scotland. Marco had no knowledge of whether the electrical schematic diagrams were passed along to subsequent purchasers.

ABC Polymer did not purchase Line 3 directly from Faré; it purchased it second-hand from a third party in 2004. Before purchasing Line 3, ABC Polymer hired Durall as an independent contractor to travel to the Netherlands, where Line 3 was then located, to inspect Line 3 to ensure that it was the proper kind of machine ABC Polymer needed and to ensure its quality. Durall confirmed during his testimony that, at the time he inspected Line 3 in the Netherlands, he also inspected various

documents that were associated with Line 3, including documents pertaining to how "to operate Line 3," "[t]he safety devices that came with [Line 3]," "[e]lectrical schematics" or "electrical drawings," and "[t]he guarding that was available ...." Durall submitted into evidence the documents that were provided with Line 3 at the time that ABC Polymer purchased Line 3.

It appears that the documents that Marco testified were sent with Line 3 to the original purchaser in 1989 differ in some respects from the documents provided to ABC Polymer at the time that ABC Polymer purchased Line 3 in 2004. Durall was shown Plaintiff's Exhibit 6, discussed above, and testified that it "does not appear to be the same drawing that is -- that came with Line 3." Durall answered the following question pertaining to Plaintiff's Exhibit 6 affirmatively: "But this schematic is correct that was provided by the manufacturer and this schematic mostly deals with emergency stops, correct, full stops, right?" Durall offered the following testimony pertaining to Plaintiff's Exhibit 7, also discussed above:

> "[Pablo's trial attorney:] And this would be the -- an electrical schematic for Line 3 at ABC Polymer, correct?
>
> "[Durall:] Supposedly so, yes.

"....

"[Pablo's trial attorney:] And does this diagram or this schematic include what appears to be a limit switch that is triggered by raising the gates?

"[Durall:] That would be correct, but it's also not representative of the line that's at ABC [Polymer's plant]. This only has two godet's and a hot roll. That's not how Line 3 was delivered. This is a completely different line.

"[Pablo's trial attorney:] But Godet 1 identified on this schematic has a limit switch identified where when you raise --

"[Durall:] On this diagram, yes.

"[Pablo's trial attorney:] Where when you raise the gate, the limit switch is triggered, and it slows the rollers down, right?

"[Durall:] According to this document, yes."

Durall confirmed during his testimony that he did not visibly observe anything on Line 3, Godet 1, "that would make [him] think that the [security gate] on Godet 1 should have been interlocked." Durall provided the following testimony, indicating that, at the time of his inspection of Line 3 in the Netherlands, Durall thoroughly examined the extensive documentation associated with Line 3:

"[Durall's trial attorney:] … [T]here was a large box of documents at the inspection. Did you review them at that time or did you just inspect [Line 3]?

"[Durall:] No, I actually pulled the documents -- I had to pull the documents out to verify that it had the mechanical prints in there. The scope of what I was trying to do was make sure that we had the complete machine was [sic] reassembly.

"I was not going to be the person to reassemble [Line 3], so we carefully went through the documents, made sure the wiring was complete, reviewed the electrical documents to make sure all the items in the electrical documents were actually represented as what [Line 3] was, and checked everything as thoroughly as possible to make sure all the documentation was there.

"[Durall's trial attorney:] And this thorough and careful review of the documents did you find anything at all that indicated there should be a limit switch at the [security gate on Godet 1] that would make that guard interlock?

"[Durall:] I never saw anything like that, no."

In examining the documentation and wiring diagram provided to ABC Polymer with Line 3, Durall further testified:

"[Durall's trial attorney:] What does this -- does this wiring diagram indicate to you and did it indicate to you while you were employed at ABC [Polymer] that a limit switch should have been included on the [security gate] with Godet 1?

"[Durall:] No, this would not."

Leader provided the following similar testimony concerning the documents that were delivered to ABC Polymer with Line 3 at the time ABC Polymer purchased the machine:

11

"[Durall's trial attorney:] And what does [Defendants' Exhibit 3] show?

"[Leader:] This shows a slow down circuit.

"[Durall's trial attorney:] All right. Does it show that there was an interlocking [security gate] on this godet?

"[Leader:] It does not."

Scott Broshetta, Durall's expert witness in forensic electrical engineering, gave the following testimony at trial concerning what the documentation provided to ABC Polymer at the time of the purchase of Line 3 showed:

"[Durall's trial attorney:] Can you explain to the court what [Defendants' Exhibit 3] shows?

"[Broshetta:] Yes, I can. This would be in Faré's mode of creating schematics. This would be the area that the initiation of the slowdown circuit would take place. So this would be -- if there were limit switches on the machine that were used in conjunction with the lifting of the gate in front of the godets, this is where those switches would be detailed and located.

"[Durall's trial attorney:] All right. So my follow-up question is, does this schematic show these limit switches anywhere and could you explain that and explain what it actually does show?

"[Broshetta:] Yes. So [to] answer your question, no, it does not show limit switches anywhere on this page that would be used to initiate slowdown by means of lifting the gate in front of the godet rollers. …

12

"….

"[Durall's trial attorney:] So do I understand your testimony, do any of these Faré documents that came with [Line 3] to ABC [Polymer] indicate that a limit switch should have been on the [security] gate for that machine?

"[Broshetta:] I reviewed the entire Defendants' Exhibit 2] and I saw nowhere in that entire schematic that detail limit switches that would be used with the lifting of the gate to put the machine into slow down mode.

"[Durall's trial attorney:] So that was not contained on any of the schematic diagrams in the Faré documents that came to ABC [Polymer] with the machine. Is that what you're saying?

"[Broshetta:] If what I'm given is Defendants' Exhibit 2 are the schematics that came with [Line 3], then that is true.

"[Durall's trial attorney:] All right. Would an electrician or an installer looking at these schematics from Faré be made aware that a limit switch or [security gate] was provided with [Line 3]?

"[Broshetta:] I don't think either one. There's definitely no indication of a limit switch. I don't think the schematics would actually show a [security gate] either, but I can't confirm the gate itself only the electronic for a limit switch.

"[Durall's trial attorney:] Did the documents indicate to an electrician or installer that a limit switch should have been installed with the [security gate]?

"[Broshetta:] No.

"[Durall's trial attorney:] OK. Based on your expertise and your view of these schematic diagrams … do you believe

13

that either Mr. Leader or Mr. Durall should have known to install a limit switch on the [security gate] and roll stand of Godet 1 on Line 3?

"[Broshetta:] No, I do not. And after my many years of reviewing schematics over the course of my career, if I ever see these schematics, I would not have known to put a limit switch on the machine."

Following Durall's inspection of Line 3 in the Netherlands, ABC Polymer purchased Line 3, and it was transferred to ABC Polymer's plant located in Mexico and installed. Durall testified that, in May 2004, near the end of the installation process of Line 3 in ABC Polymer's Mexican plant, he traveled to the Mexican plant, as an independent contractor for ABC Polymer, to help complete the installation of Line 3. Upon arriving at the Mexican plant, Durall confirmed that the same documents that had been with Line 3 in the Netherlands were with Line 3 at the Mexican plant. Durall confirmed during his testimony that "all the guards that [he] had inspected in the Netherlands were also in Mexico …."

In 2007, ABC Polymer hired Durall in a full-time capacity to serve as its director of operations. Subsequently, in 2008 or 2009, Line 3, along with the same documents that had been with Line 3 in the Netherlands and in Mexico, was transferred to ABC Polymer's plant in Helena and assembled there. Durall testified that, after Line 3 was assembled in

ABC Polymer's Helena plant, he did a thorough inspection and confirmed that "all the safety guards were installed and installed correctly." Durall testified, however, that he did not "reach out to Faré to confirm that [Line 3] had all the safety guards as originally designed …." As finally assembled and installed, Line 3, Godet 1, had the following guards: (1) a kick bar, which, when activated, completely stops Line 3; (2) an emergency stop button, which, when activated, completely stops Line 3; (3) an emergency pull cord, which, when activated, completely stops Line 3; and (4) the security gate, discussed extensively above, which was not electronically interlocked with a limit switch. Durall testified that he had never disabled or removed a safety device from a machine owned and used by ABC Polymer and that he had no knowledge that a safety device was missing from a machine and failed to take action. In 2015, Durall resigned from his employment with ABC Polymer to accept a job with a different company.

Although the security gate on Line 3, Godet 1, was not electronically interlocked with a limit switch, ABC Polymer had another extruder machine in its Helena plant that was manufactured by Faré that did have a security gate on a godet that was electronically

interlocked with a limit switch. Durall testified that he was familiar with Line 5 and was aware that a security gate on a godet on Line 5 was electronically interlocked with a limit switch.

Estillado, who spoke only Spanish, was hired by ABC Polymer on or about April 15, 2017. At the time of Estillado's hiring, ABC Polymer had the following general safety rule in place:

> "Machine guards are installed as a means of protecting you from those parts of the equipment which could cause injury should you make contact while the equipment is in operation. For this reason, these guards must be left in place except when maintenance is being performed and then the guard may be removed only when the equipment controls are locked out by the person performing the maintenance."

Despite that rule, the affidavit of Luisa Mariel Miller, an employee of ABC Polymer, contains the following testimony:

> "3.) Part of my job at ABC Polymer was to communicate between supervisors and Spanish speaking employees. I would do this with the Spanish speaking machine operators.

> "4.) I personally knew Catalina Estillado. I was familiar with the Faré machine located at Line 3. I communicated with Catalina about how the operators were supposed to cut wraps that would develop around the rollers. The supervisors told me to instruct the operators, including Catalina[,] to cut or remove the wraps at production speed, with the [security gate] in the up position.

> "5.) The operators, including Catalina Estillado, were instructed to cut the wraps with handheld cutting tools like a

16

box cutter. The supervisors did not want to shut the Faré machine down to remove the wraps, unless it was absolutely necessary. The Faré machine on Line 3 usually ran during production with the [security gate] up."

Leader's written statement to OSHA states: "Here we've been running with the [security gate] up most of time. I say it's just a really bad habit not keeping guards in place. Even if they needed to cut a wrap they could raise it up, cut it and then put it back in place." As noted above, Durall no longer worked for ABC Polymer at the time that Estillado was hired by ABC Polymer; Durall did not train Estillado.[1]

On August 16, 2017, Estillado was working at Line 3, Godet 1. As set forth above, Estillado was most likely attempting to cut a wrap off of Godet 1 when her hand got caught in the rollers, pulling her body into Godet 1. The injuries she sustained as a result of the accident caused her death.

On September 13, 2017, Pablo filed a complaint against ABC Polymer seeking workers' compensation benefits under the Alabama

---

[1]Durall testified that, when he did work for ABC Polymer, part of his responsibilities included training new employees how to operate Line 3. Durall also testified that, during his employment with ABC Polymer, he trained employees to cut wraps off the rollers in Godet 1 by lifting the security gate and cutting the wraps with a knife while the rollers were operating at production speed.

Workers' Compensation Act, § 25-5-1 et seq., Ala. Code 1975. Pablo later amended his complaint, adding Faré, Leader, and Durall as defendants. Pablo asserted against Leader and Durall a claim alleging that Leader and Durall violated § 25-5-11 "by removing, failing to install, or failing to maintain a safety guard." Pablo also asserted claims of negligence, wantonness, premises liability, and products liability against the defendants.

On June 22, 2018, Pablo entered into a settlement agreement with ABC Polymer for his workers' compensation claim against ABC Polymer, agreeing to settle that claim for $75,000. On the same day, upon the motion of Pablo and ABC Polymer, the circuit court entered a judgment on the parties' settlement agreement but allowed ABC Polymer to "remain in this case for the limited purpose of protecting its statutory subrogation lien."

On July 19, 2018, ABC Polymer, Leader, and Durall filed an answer to Pablo's complaint. On September 10, 2018, Pablo filed a stipulation of dismissal, dismissing, with prejudice, ABC Polymer from the case. On September 12, 2018, the circuit court granted Pablo's stipulation of dismissal, dismissing ABC Polymer, with prejudice, and stating that

18

"[t]his case remains pending as to the defendants … Leader, … Durall and Faré …." On February 27, 2020, after extensive efforts to determine whether the circuit court had personal jurisdiction over Faré, Pablo and Faré filed a joint stipulation of dismissal of Faré from the underlying case. On March 5, 2020, the circuit court entered an order dismissing Faré, without prejudice.

On June 15, 2021, Leader and Durall filed a motion for a summary judgment. On July 20, 2021, Pablo filed a response to Leader and Durall's summary-judgment motion. The circuit court held a hearing on the summary-judgment motion on July 22, 2021. On August 4, 2021, the circuit court entered an order granting in part and denying in part Leader and Durall's summary-judgment motion, stating, in pertinent part, that "[t]he motion is Denied as to the § 25-5-11(b) claims …. The Motion is Granted as to any negligence/wantonness claims not permitted by § 25-5-11(b). The motion is conceded as to premises liability." Pablo's remaining wrongful-death claim based on § 25-5-11 was then set for a bench trial.

The bench trial commenced on March 14, 2022. At the close of Pablo's case, Leader and Durall filed a motion for a judgment on partial

findings under Rule 52(c), Ala. R. Civ. P., arguing that Pablo had failed to present a "legally sufficient evidentiary basis for the [circuit] court to rule in his favor." The circuit court did not rule on that motion at that time, as is permitted under Rule 52(c). On June 14, 2022, after all the evidence had been submitted and both sides had rested, the circuit court entered an extensive final judgment in favor of Pablo on his claim under § 25-5-11. The circuit court's judgment states, in pertinent part:

> "This is a wrongful death case, and the recovery is limited by statute to punitive damages. See Ala. Code [1975,] § 6-5-410. Punitive damages are determined by the 'gravity of the wrong done[,] the propriety of punishing the wrongdoer, and the need for deterring others from committing the same or similar wrongful conduct.' Deaton, Inc. v. Burroughs, 456 So. 2d 771, 776 (Ala. 1984) (citing Estes Health Care Centers, Inc. v. Bannerman, 411 So. 2d 109 (Ala. 1982)). [Pablo] has satisfied each element of his cause of action and is entitled to punitive damages for wrongful death. Accordingly, this court finds for the Plaintiff, CRESCENCIO PABLO, and hereby awards damages in the amount of three-million dollars ($3,000,000.00), jointly and severally against [Leader and Durall], which is the amount necessary[,] based on the gravity of the wrong, to adequately punish [Leader and Durall], and to deter similar conduct from others."

(Capitalization in original.) On July 22, 2022, Leader and Durall appealed.

After filing the notice of appeal, on August 25, 2022, Leader filed in the circuit court a "suggestion of pendency of bankruptcy … and

automatic stay of proceedings," indicating that he had filed a petition for relief under federal bankruptcy laws in the United States Bankruptcy Court for the Northern District of Alabama and had listed Pablo as a general unsecured creditor with a judgment claim of $3,000,000. On November 27, 2023, the bankruptcy court entered an order determining that the circuit court's judgment against Leader is "dischargeable pursuant to 11 U.S.C. § 524(a)." Pablo v. Leader (In re Leader), 656 B.R. 459, 469 (Bankr. N.D. Ala. 2023). As a result, the appellee's brief filed with this Court states that "only … Durall continues in this appeal." Durall's brief at i n.1. Pablo acknowledges in his brief that Leader has been "discharged in bankruptcy." Pablo's brief at 40. Accordingly, it being apparent from the records before this Court that Leader's appeal has been abandoned on account of his having the judgment against him formally discharged, we dismiss the appeal as to him ex mero motu. See Francis v. Scott, 260 Ala. 590, 594, 72 So. 2d 93, 97 (1954)("When it is apparent from the court records that on appeal the question has become moot (or the appeal abandoned), the court will dismiss it ex mero motu. Willis v. Buchman, 240 Ala. 386, 387, 199 So. 892, 132 A.L.R. 1179 [(1940)]; Coleman v. Mange, 238 Ala. 141, 189 So. 749 [(1939)]; McCord

21

v. Lanier, 207 Ala. 663, 93 So. 546 [(1922)]; Postal Tel.-Cable Co. v. City

of Montgomery, 193 Ala. 234, 69 So. 428 [(1915)]; Agee v. Cate, 180 Ala.

522, 61 So. 900 [(1913)].").

Standard of Review

"'Because the trial court heard ore tenus evidence during the bench trial, the ore tenus standard of review applies. Our ore tenus standard of review is well settled. "'When a judge in a nonjury case hears oral testimony, a judgment based on findings of fact based on that testimony will be presumed correct and will not be disturbed on appeal except for a plain and palpable error.'" Smith v. Muchia, 854 So. 2d 85, 92 (Ala. 2003) (quoting Allstate Ins. Co. v. Skelton, 675 So. 2d 377, 379 (Ala. 1996)).

"'"'The ore tenus rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses.' Hall v. Mazzone, 486 So. 2d 408, 410 (Ala. 1986). The rule applies to 'disputed issues of fact,' whether the dispute is based entirely upon oral testimony or upon a combination of oral testimony and documentary evidence. Born v. Clark, 662 So. 2d 669, 672 (Ala. 1995). The ore tenus standard of review, succinctly stated, is as follows:

"'"'[W]here the evidence has been [presented] ore tenus, a presumption of

> > correctness attends the trial court's conclusion on issues of fact, and this Court will not disturb the trial court's conclusion unless it is clearly erroneous and against the great weight of the evidence, but will affirm the judgment if, under any reasonable aspect, it is supported by credible evidence.'"
>
> > "'Reed v. Board of Trs. for Alabama State Univ., 778 So. 2d 791, 795 (Ala. 2000) (quoting Raidt v. Crane, 342 So. 2d 358, 360 (Ala. 1977)). However, "that presumption [of correctness] has no application when the trial court is shown to have improperly applied the law to the facts." Ex parte Board of Zoning Adjustment of Mobile, 636 So. 2d 415, 417 (Ala. 1994).'
>
> "Kennedy v. Boles Invs., Inc., 53 So. 3d 60, 67-68 (Ala. 2010). Furthermore, where there are no disputed facts and where the judgment is based entirely upon documentary evidence, our review is de novo. Weeks v. Wolf Creek Indus., Inc., 941 So. 2d 263, 268-69 (Ala. 2006)."

E.B. Invs., L.L.C. v. Pavilion Dev., L.L.C., 212 So. 3d 149, 161-62 (Ala. 2016).

## Discussion

Pablo brought this action under § 25-5-11. "That section provides that an employee injured in the scope of his employment may, in certain

circumstances, bring an action for damages for his injuries, in addition to any recovery he may be entitled to under the Alabama Workers' Compensation Act." Layne v. Carr, 631 So. 2d 978, 980 (Ala. 1994). Section 25-5-11 also "authorizes the dependents of a deceased employee to file a wrongful-death action against a culpable third party ...." Ex parte Texas Loss Control Sys., LLC, 164 So. 3d 602, 604 (Ala. Civ. App. 2014). Pablo asserts in this case that Durall willfully and intentionally removed or disabled the electronically interlocking limit switch from the security gate on Line 3, Godet 1, and also that Durall willfully and intentionally trained Estillado to bypass the security gate and cut wraps off the rollers in Godet 1 while they were operating at production speed. Section 25-5-11 states, in pertinent part, as follows:

"(b) If personal injury or death to any employee results from the willful conduct, as defined in subsection (c) herein, of any officer, director, agent, or employee of the same employer ..., the employee shall have a cause of action against the person ....

"(c) As used herein, 'willful conduct' means any of the following:

"....

"(2) The willful and intentional removal from a machine of a safety guard or safety device provided by the manufacturer of the machine with

24

knowledge that injury or death would likely or probably result from the removal; provided, however, that removal of a guard or device shall not be willful conduct unless the removal did, in fact, increase the danger in the use of the machine and was not done for the purpose of repair of the machine or was not part of an improvement or modification of the machine which rendered the safety device unnecessary or ineffective."

Concerning claims under § 25-5-11(c)(2), a plurality of the Court of Civil Appeals, quoting well-established authority, has stated:

"The Alabama Supreme Court has commented: 'Section 25-5-11(c)(2) cannot be construed to allow a coemployee action in every situation where an employee is injured on the job. The legislature expressly limited exceptions to the exclusivity of the workers' compensation scheme.' Layne v. Carr, 631 So. 2d 978, 982 (Ala. 1994). Instead, to succeed in an action under § 25-5-11(c)(2), a plaintiff must prove:

"'1. The safety guard or device [was] provided by the manufacturer of the machine;

"'2. The safety guard or device [was] removed from the machine;

"'3. The removal of the safety guard or device ... occurred with knowledge that injury would probably or likely result from that removal; and

"'4. The removal of the safety guard or device [was] not ... a part of a modification or an improvement that rendered the safety guard or device unnecessary or ineffective.'

"Harris v. Gill, 585 So. 2d 831, 835 (Ala. 1991)."

25

Murray v. Manz, 813 So. 2d 918, 921 (Ala. Civ. App. 2001).

In its judgment, the circuit court determined that Pablo had presented sufficient evidence to satisfy each element of his § 25-5-11(c)(2) claim. Pertaining to the first element set forth above, the circuit court determined that it was undisputed that Faré had designed and manufactured Line 3, Godet 1, with a security gate that was electronically interlocked with a limit switch so that the rollers in Godet 1 slowed when the security gate was lifted and that Line 3 was shipped to the original purchaser with that safety device intact. The circuit court determined that Faré, the manufacturer of Line 3, provided the safety device (the security gate that was electronically interlocked with a limit switch) to the original purchaser of Line 3. Pertaining to the second element of Pablo's § 25-5-11(c)(2) claim, the circuit court determined that, at the time of Estillado's injury, it was undisputed that the security gate on Line 3, Godet 1, was no longer electronically interlocked with a limit switch and, thus, that the rollers in Godet 1 did not slow down from production speed when the security gate was lifted. Based on that fact, the circuit court concluded that Durall had "removed" the safety device that Faré had provided to the original purchaser of Line 3 by not

26

reconnecting the security gate to the limit switch. The circuit court also determined that Durall, while employed by ABC Polymer, had trained employees to cut wraps on the rollers in Godet 1 by lifting the security gate on Godet 1 and cutting the wraps while the rollers were operating at production speed. The circuit court determined that such training provided by Durall was the equivalent of bypassing the safety device, which ultimately resulted in Estillado's death. Pertaining to the third element of Pablo's claim, the circuit court determined that Durall knew that injury to an employee would likely result from his action of failing to ensure that the security gate on Godet 1 was electronically interlocked with a limit switch and from his action of training employees to bypass the security gate. Finally, pertaining to the fourth element of Pablo's claim, the circuit court determined that the removal of the safety device at issue in this case was not a modification or an improvement that rendered the safety device unnecessary.

On appeal, Durall argues that Pablo did not present sufficient evidence to support the circuit court's judgment in Pablo's favor; Durall argues that Pablo did not present sufficient evidence to support any of the elements of his claim. Pertaining to the first element of Pablo's claim

("'[t]he safety guard or device [was] provided by the manufacturer of the machine,'" Murray, 813 So. 2d at 921), Durall argues that, although Pablo demonstrated that Line 3, Godet 1, was manufactured and provided by Faré to the original purchaser with an electronically interlocked security gate, Pablo failed to present evidence indicating that Line 3 was provided to ABC Polymer and Durall with an electronically interlocked security gate. Durall acknowledges that Line 3 was provided to ABC Polymer and Durall with a security gate on Line 3, Godet 1, but he argues that the security gate was not electronically interlocked with a limit switch at the time ABC Polymer purchased Line 3. Durall argues that "[t]o allow Faré's alleged provision of the interlocking [security gate] to someone other than ABC [Polymer] or Durall certainly cannot be in line with what the legislature intended when drafting this limited exception for willful employee conduct." Durall's brief at 26-27. As a result, Durall argues, the circuit court's judgment must be reversed because, he argues, the first element of Pablo's claim is not supported with sufficient evidence.

Durall cites numerous cases in this section of his brief, but none of those cases involve the same situation presented in the present case or

28

support his argument. Here, it is undisputed that Faré, the manufacturer, designed and manufactured Line 3, Godet 1, with a security gate that was electronically interlocked with a limit switch and provided Line 3 to the original purchaser with that safety device intact. The parties have presented no evidence, however, indicating what happened to the machine from the time it was provided to the original purchaser until Durall inspected Line 3 in the Netherlands in 2004. Apparently, however, the security gate on Line 3, Godet 1, was, at some point, disconnected from the limit switch. Durall has presented unrebutted evidence indicating that, at the time he inspected Line 3 in the Netherlands, the security gate on Godet 1 was not electronically interlocked with a limit switch and that nothing in the documentation provided to him with Line 3 indicated that the manufacturer had designed and manufactured it that way. Accordingly, the evidence before us indicates that the machine was designed, manufactured, and provided to the original purchaser with the safety device and that it was provided to ABC Polymer without the safety device.[2]

---

[2]In its final judgment, the circuit court, citing a specific portion of a written statement given by Leader to OSHA, states that Leader "testified to OSHA that all safety devices on Line 3, Godet 1, were original." The

It appears that Pablo has presented sufficient evidence to support the first element of his claim. In bringing a claim under § 25-5-11(c)(2), Pablo is asserting that Durall willfully and intentionally removed a safety device from a machine that the manufacturer had included as part of the design and manufacturing of that machine. Obviously, to prove that a safety device has been removed from a machine, it must first be proven that a machine was manufactured with a safety device attached to it. The purpose of the first element of a claim under § 25-5-11(c)(2) is to demonstrate that the at-issue machine was manufactured with a safety device attached to it. Pablo has presented unrebutted evidence demonstrating that Faré designed, manufactured, and provided to the original purchaser Line 3 with a security gate on Godet 1 that was electronically interlocked with a limit switch. Further, the limit switch itself is still present in Line 3; the security gate on Godet 1, however, is not electronically interlocked with that limit switch. That is sufficient

_____

portion of Leader's statement cited by the circuit court actually states, however, that Godet 1 "where accident happened is original and so is the last one." Leader's written statement given to OSHA does not make any specific comment about the safety devices on Line 3, Godet 1; he simply indicated that Line 3, Godet 1, was original. That evidence does not indicate that Line 3 was provided to ABC Polymer with the security gate on Godet 1 electronically interlocked to a limit switch.

evidence to satisfy the first element of a claim under § 25-5-11(c)(2). Durall does not dispute that evidence and agrees that the security gate on Godet 1 was not electronically interlocked with a limit switch when ABC Polymer purchased Line 3; he instead argues that he was not the one to remove the safety device. That is a relevant argument in offering a defense to a claim under § 25-5-11(c)(2), but such an argument goes to the second element of Pablo's claim, discussed below.

The second element of Pablo's claim is whether "[t]he safety guard or device [was] removed from the machine." Harris v. Gill, 585 So. 2d 831, 835 (Ala. 1991). In this case, it is undisputed that, at the time of the accident, the security gate on Godet 1 had been disconnected from the limit switch, which essentially "removed" the benefit of the limit switch. The question in this case, however, is not, generally, whether the safety device was removed but, specifically, whether Durall himself willfully removed the safety device from Line 3, Godet 1. See § 25-5-11(b) ("If personal injury or death to any employee results from the willful conduct, as defined in subsection (c) herein, of any … employee of the same employer …." (emphasis added)); see also Means v. Glover, 342 So. 3d 539, 550 (Ala. 2021)("[Section] 25-5-11(c)(2) requires the co-employee to

31

have willfully and intentionally removed a manufacturer-provided safety device before liability can be found."). The circuit court determined that Durall had "removed" the safety device by failing to reconnect the security gate on Godet 1 to the limit switch and by training employees other than Estillado to cut wraps from the rollers in Godet 1 while they were operating at production speed. See Murray, 813 So. 2d at 921 ("The term 'removal' [as used in § 25-5-11(c)(2)] has been extended to include the failure to install a safety guard or device, Bailey v. Hogg, 547 So. 2d 498 (Ala. 1989); [and] the bypassing of a safety guard or device, Harris [v. Gill], 585 So. 2d [831,] 837 [(Ala. 1991)] …."); but see Williams v. Price, 564 So. 2d 408 (Ala. 1990)(holding that the failure to give instructions regarding safety procedures is not equivalent to the removal of a safety device).

In his brief on appeal, Durall argues that Pablo "presented no evidence that Durall 'removed' any interlocking feature from the barrier guard." Durall's brief at 28. Durall argues that the circuit court erred in determining that Durall had willfully and intentionally "removed" the interlocking limit switch on Line 3, Godet 1, by failing to install it because, Durall argues, no evidence was presented indicating that Durall

32

should have electronically interlocked the security gate with a limit switch.[3] Durall is correct. Durall presented extensive evidence indicating that, at the time he inspected Line 3 in 2004, before ABC Polymer's purchase of it, the security gate on Godet 1 was not electronically interlocked with a limit switch. Not only was the security gate not electronically interlocked with a limit switch, but also Durall presented evidence indicating that there was nothing on Line 3 itself or in the extensive documentation provided with Line 3 that indicated that the security gate on Godet 1 should be electronically interlocked with a limit switch. Durall presented the expert testimony of Broshetta, which

---

[3]We note that, in this section of his brief, Durall interweaves the same argument he raised before -- namely, that he was not "provided" with the at-issue safety device because, when Line 3 was purchased by ABC Polymer, the security gate on Godet 1 was not electronically interlocked with a limit switch. As noted above, that argument is misguided and not persuasive. It is undisputed that Faré provided Line 3 to the original purchaser with the at-issue safety device. The focus of this element of Pablo's claim is whether Durall willfully and intentionally removed that safety device. The evidence indicates that the at-issue safety device was removed; the question is whether Durall is the one that willfully and intentionally removed it. Durall does argue that the evidence does not demonstrate that he was the one to remove the at-issue safety device and that he never had any knowledge that the security gate should have been electronically interlocked with a limit switch. As explained infra, that argument is persuasive.

also indicated that there was no indication that the security gate on Godet 1 should be electronically interlocked with a limit switch.

Pablo did present the deposition testimony of Marco, which indicated that the documentation provided with Line 3 to the original purchaser, which was not ABC Polymer, showed that the security gate on Godet 1 should have been electronically interlocked with a limit switch. However, the evidence before us indicates that that documentation was not provided to ABC Polymer or Durall at the time Durall inspected and ABC Polymer purchased Line 3, and there is nothing before us indicating that the documentation provided to ABC Polymer and Durall was lacking in any way. The evidence indicates that ABC Polymer and Durall were provided with complete and extensive documentation pertaining to Line 3 and its operation and components, including all safety devices, and that none of that documentation indicated that the security gate on Godet 1 should be electronically interlocked with a limit switch. There is no evidence explaining the discrepancy in the documentation, but the end result is that the evidence before us shows that Durall was provided with extensive documentation pertaining to Line 3 at the time of his inspection and that that

34

documentation did not indicate that the security gate on Godet 1 should have been electronically interlocked with a limit switch.[4] In other words, the evidence does not indicate that Durall willfully and intentionally failed to install an available safety guard.

In determining that Durall had "removed" the at-issue safety device, the circuit court relied upon Bailey v. Hogg, 547 So. 2d 498 (Ala. 1989), a discussion of which helps provide a contrast to the present case. In Bailey, an employee was injured in the course of his employment at a concrete-manufacturing plant. The concrete manufacturer had purchased a used concrete-manufacturing plant second-hand from another concrete manufacturer. A supervisor for the concrete manufacturer that purchased the concrete-manufacturing plant was responsible for assembling the plant. After assembly of the plant, an

---

[4]Marco testified that Faré could have provided the documentation it had indicating that the security gate on Godet 1 should have been electronically interlocked with a limit switch but that Durall did not request such documentation. There is no evidence, however, demonstrating that Durall had any indication that the documentation provided to him at the time he inspected Line 3 was incomplete or in need of supplementation. From the evidence before us, it appears that Durall was provided with sufficient documentation and that he had no reason to seek further documentation from Faré to ensure that all safety devices had been provided and installed.

employee was tasked with cleaning it. While cleaning the assembled plant, the employee suffered an injury to his thumb when it was caught between a belt and a pulley on a machine. The concrete manufacturer had received with the concrete-manufacturing plant "a guard that would have covered this pulley, but had not installed it." Bailey, 547 So. 2d at 499. The supervisor's deposition testimony indicated that "he knew that this guard and other guards had been delivered with the plant and that he knew that they had not been installed, but that he did not know why the guards had not been installed." Id.

The employee sued the supervisor, among others, under § 25-5-11 alleging that the supervisor had "removed" the guard over the pulley that caused the employee's injury by failing to install it. The trial court entered a summary judgment in favor of the supervisor, determining that the supervisor had acted negligently in failing to install the guard, but not willfully. The employee appealed.

On appeal, this Court reversed the trial court's judgment, stating:

"By making the willful and intentional removal of a safety guard the basis for a cause of action without the higher burden of proof of 'intent to injure' found in [Ala. Code 1975, § 25-5-11](a), the legislature acknowledged the important public policy of promoting safety in the workplace and the importance of such guards in providing such safety. The same

36

dangers are present when an available safety guard is not installed as are present when the same guard has been removed. To say that an injury resulting from the willful and intentional removal of a safety guard is actionable but that an injury resulting from the willful and intentional failure to install the same guard is not contravenes that important public policy. To hold that the willful and intentional failure to install an available safety guard is not actionable would allow supervisory employees to oversee assembly of new machinery, instruct their employees not to install the safety guards, and then, when an employee is injured due to the lack of a safety guard, claim immunity from suit.

"We hold that the willful and intentional failure to install an available safety guard equates to the willful and intentional removal of a safety guard for the purposes of Ala. Code 1975, § 25-5-11(c)(2). There was evidence from which a jury could find that [the supervisor's] failure to have the safety guard installed was willful and intentional. Therefore, the trial court erred in entering summary judgment in favor of [the supervisor]."

Id. at 499-500.

In the present case, unlike in Bailey, there is nothing indicating that Durall willfully or intentionally failed to install a safety device. The evidence demonstrates that all the information that Durall had did not indicate that the security gate on Godet 1 should have been electronically interlocked with a limit switch. Durall installed Line 3 in accordance with the documentation provided to ABC Polymer along with Line 3, and there is no evidence indicating that Durall should have had any reason

to believe that that documentation was lacking in some way. In <u>Bailey</u>, it was undisputed that the supervisor (the co-employee) in that case was provided with a safety device, knew that the safety device should have been installed, and willfully and intentionally made the decision not to do so. In contrast, in the present case, although Line 3 was manufactured with the at-issue safety device, there is nothing to indicate at what point the safety device was uninstalled, there is no evidence indicating that Durall knew that the security gate on Godet 1 should have been electronically interlocked with a limit switch, and there is no evidence indicating that Durall willfully and intentionally chose not to install the safety device. This case is distinguishable from <u>Bailey</u>. The circuit court erred in determining that Pablo presented sufficient evidence to support the conclusion that Durall willfully and intentionally "removed" the at-issue safety device on this basis.

Durall also argues that the circuit court erred in determining that he "removed" the at-issue safety device by training employees, other than Estillado, to bypass the security gate and cut wraps off the rollers in Godet 1 while they were operating at production speed. Durall, citing <u>Williams</u>, supra, argues that instructions given to bypass a safety device

are not the equivalent of removing a safety device from a machine and, thus, that Pablo's evidence indicating that Estillado was instructed to bypass the security gate on Godet 1 to cut wraps off of the rollers therein is not evidence sufficient to prove the second element of his claim. Durall is correct.

The circuit court did not discuss <u>Williams</u> in its judgment. Instead, the circuit court relied upon <u>Harris</u>, which is distinguishable from the present case. In <u>Harris</u>, a company purchased a punch press from a used-equipment dealer approximately 40 years after it had been manufactured. 585 So. 2d at 833. This Court provided the following facts concerning the machine and its safety devices:

> "When the press arrived at [the company's plant], it was basically unusable. It was neither equipped with nor accompanied by any safety buttons, guards, or devices. [The company's] engineering department had to rewire and rework the press in order to get it operational. In June 1985, when the press first was put into operation at [the plant], it had a panel across the front that had been installed by the engineering department. The panel contained, among other things, palm control buttons to activate the press and an emergency stop button. At that time, the palm control buttons were the only activating device on the press. Sometime thereafter, [the company] began making a new kind of collar for the gas cylinders; the new collars were longer or taller than before. Because of their size, weight, and configuration, these collars would fall off the die when the operator removed his hands to depress the palm control buttons. As a result, in

39

order to keep the collars in place on the die and to punch holes in the collars with the exactness and precision necessary for their eventual use, the operator had to hold the collar firmly in place throughout the operating cycle. The operator could not use his hands to activate the press with the palm control buttons, because it physically was not possible for him to hold the collar in place and depress the palm control buttons at the same time. Subsequently, at some point between June 1985 and early 1987, a foot control pedal (which was equipped with a cover and an elevated pedal to prevent accidental depression) was added to the press as an alternative activating device to enable the operator to activate the press with his foot while holding the collar in place with his hands. Thereafter, either the foot control or the pre-existing palm control buttons could be used to activate the press."

Id. An employee of the company was operating the press when a piece of metal that had been punched from the collar got stuck in the press. Id. at 834. As the employee was trying to dislodge the stuck metal, he accidentally depressed the foot-control pedal, activating the press, which amputated two of the employee's fingers. Id.

Subsequently, the employee sued two of his co-employees, who were supervisors for the company and were not present at the time of the accident, under § 25-5-11(c)(2), alleging, among other things, that the co-employees had removed a safety device from the press, which made it unsafe to use. The employee alleged that the co-employees had willfully and intentionally removed the palm-control buttons from the press by

adding the foot-control pedal, which bypassed the palm-control buttons. The co-employees filed a motion for a summary judgment, which the trial court granted. The employee appealed.

On appeal, this Court reversed the trial court's judgment. This Court provided the following statement of the issue raised by the parties' arguments:

"[The co-employees] contend that the 'removal' of a safety device or guard from a machine requires more than disabling a control or using an alternative control that makes the other control ineffective. They contend that 'removal' requires a physical separation from the machine.

"[The employee] contends that the act of bypassing the palm control buttons, which were the safety device that would have prevented his injury, constituted the 'removal' of a safety device or guard.

"Thus, the question becomes whether the use of the alternative foot control instead of the palm control buttons constituted a 'removal from the machine of a safety guard' within the meaning of § 25-5-11(c)(2) -- in other words, even though there was no physical removal of the palm control buttons, but rather an installation of a system designed to bypass the palm control buttons, did such action constitute 'removal' within the meaning of § 25-5-11(c)(2)?"

Harris, 585 So. 2d at 836. This Court, relying upon Bailey, stated:

"Applying the rationale of Bailey [v. Hogg, 547 So. 2d 498 (Ala. 1989)], we hold that the act of 'bypassing' a safety device of a particular machine that would prevent an injury -- specifically, in the instant case, the act of bypassing the

41

palm control buttons, the safety device on the press that would have prevented [the employee] from inserting his hand at the point of operation during operation and, thereby, would have prevented the loss of his fingers -- is encompassed within the word 'removal.' As we found in Bailey, supra, to hold otherwise would contravene public policy; it would allow supervisory employees to instruct their employees to perform a certain operation after a safety device related to that operation had been removed -- it would allow a supervisor in this case to instruct an operator to cut a particular material on a press by holding the material with both hands and utilizing the foot control, thus requiring the operator to bypass the palm control buttons that constituted the safety device that would have prevented the injury that occurred."

Id. at 837.

As is apparent from the above discussion, the safety device that was bypassed in Harris was bypassed not by training or by the giving of verbal instructions, as in the present case, but by the installation of an entirely different mechanism on the machine. As was stated by the Court of Civil Appeals in Bates v. Riley, 130 So. 3d 1225, 1230 (Ala. Civ. App. 2013),

"the supreme court held in Harris [v. Gill, 585 So. 2d 831 (Ala. 1991),] that the 'removal' of a safety device occurs when a machine is permanently altered to bypass that device and render it ineffective for its safety purposes. See also Cunningham v. Stern, 628 So. 2d 576 (Ala. 1993) (co-employees who allowed worker to operate press that had been modified to bypass palm-control buttons were not entitled to summary judgment since the act of bypassing safety device

42

constituted removal of safety device for purposes of § 25-5-11(c)(2))."

(Emphasis added.)

There has been no evidence presented indicating that Durall bypassed the security gate on Godet 1 by permanently altering Line 3. Instead, the allegation made by Pablo is that Durall "bypassed" the security gate on Godet 1 by training employees, other than Estillado, to lift the security gate and cut wraps off of the rollers in Godet 1 while the rollers were operating at production speed. As Durall argues, however, this Court, in Williams, has refused to extend the definition of "removal" in § 25-5-11(c)(2) to include instructions given to disregard available safety devices.

In Williams, an employee was instructed to unclog a machine used by the company he worked for to remove paper waste from the company's plant. 564 So. 2d at 409. The paper-waste-removal system consisted of numerous parts, including a baler. Id. at 409 n.1. The employee's supervisors knew that unclogging the paper-waste-removal system without turning the machine off posed a risk to the employee but, in spite of the danger posed to the employee, instructed him to unclog the machine without turning it off and provided him with the tools to do so.

43

Id. at 409. The machine also included a posted sign that instructed employees to not turn off the machine without supervisory approval. Id. As the employee was attempting to unclog the machine while it was still on, he fell into the baler and his legs were crushed. The employee sued his co-employees, those who instructed him to unclog the machine while it was still on, under § 25-5-11(c)(1) and (2). Id. The trial court entered a summary judgment in favor of the co-employees. The employee appealed.

On appeal, this Court affirmed the trial court's judgment in favor of the co-employees. Concerning the employee's claim under § 25-5-11(c)(2), this Court stated:

"We note [the employee's] argument that [one of the co-employee's] instruction to [the other co-employee] not to use the available safety devices to disengage the baler, along with the written instructions on the baling machine not to cut off the machine without permission, rendered unavailable the safety devices that cut the power to the baling machine and therefore 'removed those safety devices in violation of § 25-5-11(c)(2).' [The employee] attempts to equate these instructions with the willful and intentional removal of, or failure to install, a safety guard found in Bailey v. Hogg, 547 So. 2d 498, 500 (Ala. 1989), in which the Court held:

"'[T]he willful and intentional failure to install an available safety guard equates to the willful and intentional removal of a safety guard for the purposes of Ala. Code 1975, § 25-5-11(c)(2).'

"[The employee] argues that § 25-5-11(c)(2) does not require a showing of intent to injure as is required under § 25-5-11(c)(1). Rather, [the employee] argues that liability under § 25-5-11(c)(2) may be established merely by presenting evidence of a willful and intentional removal of, or failure to install, a safety guard and that [the co-employee's] actions in the instant case were tantamount to the willful and intentional removal of a safety device under § 25-5-11(c)(2).

"In Bailey v. Hogg, supra, as in Reed v. Brunson, [527 So. 2d 102 (Ala. 1988)], we were dealing with safety guards or safety devices provided by the manufacturers of the machines. In the instant case, we are dealing with a co-employee's instructions concerning a safety procedure. Section 25-5-11(c)(2) specifically defines willful conduct in terms of '[t]he willful and intentional removal from a machine of a safety guard.' Although we extended § 25-5-11(c)(2) in Bailey v. Hogg to equate the term 'removal' with 'failure to install,' finding the same dangers present in both situations, we cannot and will not extend § 25-5-11(c)(2) to include instructions, whether given or not given, pertaining to safety procedures. Rather, the instruction not to deactivate the baler while someone was attempting to unclog it would constitute willful conduct only if it constituted such conduct under § 25-5-11(c)(1), as interpreted by Reed v. Brunson, supra. Thus, having found no evidence of an intent to injure on the part of [the co-employee] under § 25-5-11(c)(1), we must affirm the summary judgment as to § 25-5-11(c)(2)."

Williams, 564 So. 2d at 411.

In the present case, as in Williams, the complained of "removal" was an instruction pertaining to safety procedures, mainly an instruction to Estillado to lift the security gate on Godet 1 and cut the wraps off of the rollers therein. Based on this Court's precedent in Williams, such

conduct does not constitute the "removal" of a safety device under § 25-5-11(c)(2), and, thus, the circuit court erred in concluding otherwise.

Moreover, we note that Durall had left his employment with ABC Polymer years before Estillado was hired and trained. It is undisputed that Durall did not train or instruct Estillado to do any part of her job. Although Durall admitted to instructing other ABC Polymer employees to lift the security gate on Godet 1 to cut wraps off of the rollers therein while they were operating at production speed, Durall certainly did not instruct Estillado to do so. Therefore, for this reason as well, the circuit court's judgment in this regard is in error.

We conclude that Pablo failed to establish the second element of his claim under § 25-5-11(c)(2). He failed to present evidence demonstrating that Durall willfully and intentionally "removed" the at-issue safety device by failing to electronically interlock the security gate on Godet 1 to a limit switch, and his theory that Durall "removed" the at-issue safety device by instructing employees other than Estillado to "bypass" it is not a theory of recovery supported by our precedent. As a result, the circuit court's judgment in Pablo's favor was in error and must be reversed. Our

conclusion that Pablo failed to establish the second element of his claim pretermits discussion of the remaining elements of his claim.

<u>Conclusion</u>

Based on the foregoing, we consider Leader to have abandoned the appeal of the circuit court's judgment, of which he has been discharged in bankruptcy court, and, thus, we dismiss the appeal insofar as it was brought by Leader. Concerning the appeal as it relates to Durall, we reverse the circuit court's judgment in favor of Pablo. We remand the matter for proceedings consistent with this opinion.

APPEAL DISMISSED IN PART; REVERSED AND REMANDED.

Parker, C.J., and Shaw, Wise, Sellers, and Mitchell, JJ., concur.

Cook, J., concurs in part and concurs in the result, with opinion.

Bryan and Stewart, JJ., concur in the result.

COOK, Justice (concurring in part and concurring in the result).

I concur with dismissing the appeal as to Dean Leader. I also concur with the main opinion's conclusion that the plaintiff, Crescencio Pablo, failed to present sufficient evidence in support of the second element of his claim that William Durall willfully and intentionally "removed" the safety device from Line 3, Godet 1, by disabling the electronically interlocking limit switch from the security gate on Line 3, Godet 1.

However, because I would have addressed the question of whether Durall "removed" the safety device by willfully and intentionally training employees of ABC Polymer Industries, LLC, "to bypass the security gate and cut wraps off the rollers in Godet 1 while they were operating at production speed" in a different way than the main opinion, I must concur in the result. ____ So. 3d at ____.

In addressing this issue, the main opinion contains a lengthy explanation of what the "removal" of a safety device could mean in this context and, at one point, discusses whether the "removal" of a safety device occurs when "'a machine is permanently altered to bypass that device and render it ineffective for safety purposes.'" ____ So. 3d at ____ (quoting Bates v. Riley, 130 So. 3d 1225, 1230 (Ala. Civ. App. 2013))

(emphasis altered). In my view, that in-depth discussion is not necessary for determining whether the "removal" element of this claim is satisfied in this case.

As the main opinion notes, Durall had "left his employment with ABC Polymer years before Estillado was hired and trained," and, thus, he could not have trained or instructed Estillado to do any part of her job. ____ So. 3d at ____. This alone is a sufficient basis upon which to reverse the circuit court's judgment on this issue. It is for this reason that I concur in the result.